## No. 13,231.

MILLER *v*. THE PEOPLE.

(22 P. [2d] 626)

Decided April 3, 1933. Rehearing denied May 29, 1933.

482

Mr. Foster Cline, for plaintiff in error.

Mr. Clarence L. Ireland, Attorney General, Mr. Wallace S. Porth, Assistant, for the people.

*En Banc.*

Mr. Justice Butler delivered the opinion of the court.

Archie Miller was charged with the larceny of one calf. He was found guilty and was sentenced to imprisonment in the penitentiary. He seeks a reversal of the sentence.

One E. M. Odell testified, in substance, as follows: Odell and Miller entered into an agreement, whereby Odell was to steal, at a farm designated by Miller, two calves and deliver them to Miller at a certain sand and gravel pit located off the road and about three miles from Wray. The pit was on land owned by Miller's father, and was directly across the road from the house in which Miller and his father lived. Miller was to pay Odell for the calves. If either was arrested, he was to take the blame. Odell stole the calves, put them on a trailer (also stolen by him), took them to the appointed

place, arriving at about 1 o'clock at night, turned off his automobile lights, and thereupon Odell, Miller and a man whom we will call A (who, according to the evidence, was an ex-convict) transferred the two calves to Miller's truck, and Odell received the money that Miller had promised to pay. At Miller's request, Odell signed a receipt for the money. Odell then drove from the pit toward the main highway, and was arrested by the sheriff, and immediately thereafter the sheriff arrested Miller.

The sheriff testified that on the night in question he followed an automobile truck driven by Miller; that Miller drove past the gravel pit; that the sheriff and his deputies stopped at the gravel pit "to look the place over" and sent their automobile back to town; that in about half an hour or longer Miller returned, drove off the road, stopped at the gravel pit, and turned off the truck lights; that at about 1 o'clock at night the witness saw Odell and A transfer the calves to Miller's truck; and that he then arrested both Odell and Miller.

Miller testified substantially as follows: Miller agreed to buy two calves from Odell. Miller wanted the calves delivered at the home of his father, but Odell insisted upon delivering them at the sand and gravel pit. At about 10 o'clock at night Miller started for the pit, but "inadvertently" drove a considerable distance past it. He returned and went to the pit. Odell was not there. Miller turned off his lights and went to sleep. At about 1:15 o'clock Odell and A arrived with the calves, and Odell, Miller and A transferred them to Miller's truck, and Miller paid the money he promised to pay. When Miller was about to leave the gravel pit with the calves, he was arrested. Miller denied that he agreed to be a party to the theft of the calves, and denied that he knew that the calves were stolen. He said that he had often worked days and nights in his business, and did not think the time or place of delivery unusual, in view of Odell's statements to him.

■ 1. The most important question raised is whether or not the court erred in denying the application for a new trial, based upon newly discovered evidence. Such applications are addressed to the sound discretion of the trial court, and, unless there has been an abuse of that discretion, an appellate court will not interfere with the action of the trial court. *Colorado Springs & I. Ry. Co. v. Fogelsong,* 42 Colo. 341, 94 Pac. 356; *Blass v. People,* 79 Colo. 555, 247 Pac. 177. Was the court's discretion abused in the case at bar?

In support of the motion for a new trial there were presented to the court several affidavits. Some of them related to unimportant statements said to have been made by A, who did not testify; others related to a supposed "frameup," a matter referred to in another part of this opinion; and one related to an alleged separation of the jury. We shall confine our attention to those only that merit consideration. The affidavit of Ray Bell was to the effect that, after the sentence, Odell made to the witness a statement substantially as follows: That Odell had agreed to sell the calves in question to Miller; that Miller had nothing to do with stealing them, but was merely going to buy them; that the reason Odell had fixed up the story he told on the witness stand was because he had an understanding that if he would place the blame on Miller, he (Odell) was to be made a trusty and would receive a light sentence if Miller were convicted. Miller's mother made an affidavit to the effect that after Miller was sentenced she was in the jail lobby and heard Miller ask Odell why he had made so many false statements at the trial, and that Odell said that "they" told him that if he would swear that he took one calf and that Miller took the other "they" would make him a trusty and let him off easy, and that he "agreed to go through with it." Miller, in his affidavit, swore that after he was sentenced Odell told him that he (Odell) had to tell the story he told upon the witness stand, because "he was promised to be made a trusty and would

get off easy" if he connected Miller with the cattle stealing. Foster Cline, who was employed in the case by Miller's father after sentence was pronounced, made an affidavit to the effect that he had interviewed each of the persons who made the foregoing affidavits, and that, in the event of a new trial, all of them would testify that Odell made the statements appearing in the affidavits.

According to the affidavits, Odell contradicted, or repudiated, the statements made by him under oath. In effect, he recanted, but not under the solemnity of an oath. In *Blass v. People, supra,* we quoted with approval the following statement in the opinion in *People v. Shilitano,* 218 N. Y. 161, 112 N. E. 733: "There is no form of proof so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character." In *Ives v. People,* 86 Colo. 141, 158, 278 Pac. 792, we again quoted that statement with approval. In *Quinn v. People,* 60 Colo. 217, 152 Pac. 148, a witness for the people recanted, and we upheld the action of the trial court in denying the application for a new trial.

The newly discovered evidence is subject to another weakness that merits consideration. Odell made no affidavit, and there is no showing that at a second trial his testimony would be any different from that given by him at the first trial. At a second trial the affiants would not, in the first instance, be permitted to testify that Odell had made the statements appearing in the affidavits. Such testimony would be inadmissible, unless Odell testified as he did before, and then it would be admissible, not as substantive evidence, but only by way of impeachment of Odell's credibility by showing contradictory statements made by him out of court. In *Christ v. People,* 3 Colo. 394, 396, we said: "It is a well-settled rule that newly discovered evidence going only to impeach the credit or character of a witness is not sufficient ground for a new trial. * * * The exceptions to this rule are

rare." In *Beals v. Cone,* 27 Colo. 473, 493, 62 Pac. 948, we said: "Newly discovered evidence which only goes to impeach the credit or character of a witness, is not sufficient ground for a new trial, except it is clear that such impeachment would have resulted in a different verdict." In *Colorado Springs & I. Ry. Co. v. Fogelsong, supra,* we said that ordinarily to warrant the granting of a new trial on the ground of newly discovered evidence, one of the requirements is "that it does not merely tend to impeach or contradict the former evidence, except it may be in cases where it clearly appears that it would probably change the result in case of a new trial." And in *Edwards v. People,* 73 Colo. 377, 395, 215 Pac. 855, where the question of cumulative evidence was involved, we said: "Courts will see to it that there is not a miscarriage of justice, and are sometimes indulgent in their requirements as to a showing of newly discovered evidence, if they are impressed with the conviction that there has been a miscarriage of justice, even if the newly discovered evidence be incidentally impeaching in its nature and merely cumulative, when satisfied that there is probable cause that the result would be different as the result of such testimony." It may be noted that the trial court's denial of the application for a new trial in that case was upheld. The newly discovered evidence in the present case is not "incidentally," but directly, impeaching; it could be used for no purpose other than that of impeachment. We do not take the view that there has been a miscarriage of justice in this case.

In considering whether or not the trial court abused its discretion in denying the motion for a new trial on the ground of newly discovered evidence, the affidavits should be considered in connection with the testimony given at the trial, in order to determine whether, in the event of a new trial, the newly discovered evidence probably would change the result. Miller admitted at the trial that he had agreed with Odell in advance to buy the calves. Bell's affidavit was to the effect that Odell

stated that Miller was going to buy the calves, and had nothing to do with stealing them. It was not stated that, at the time the agreement was made, it was not contemplated by both parties that Odell was to steal the calves. If one agrees in advance to buy stolen property, knowing that the property is to be stolen, he thereby encourages the perpetration of the theft, and, if the crime is committed, he is "deemed and considered as principal and punished accordingly." C. L. §6645. The statement that Miller had nothing to do with stealing the calves may well be considered as the expression of an opinion, commonly entertained by laymen, that one who does not actually take the property, but only advises or encourages another to do so, is not guilty of larceny. The Bell affidavit and the affidavits made by Miller and his mother were not of such a character as to explain satisfactorily the undisputed facts disclosed at the trial. Odell was to transfer the possession of two calves to Miller just after midnight at the gravel pit in an out-of-the-way place off the traveled road. Miller went to the pit and turned off his truck lights. At 1:15 o'clock at night Odell and an ex-convict arrived at the pit with the calves. Odell then turned off his automobile lights, and then, all automobile lights having been turned off, the calves were transferred by Odell, Miller and the ex-convict from Odell's trailer to Miller's truck. Miller's testimony to the effect that he had often worked days and nights in his business, and that he did not think the time or place of delivery "unusual," was not likely, in view of all the circumstances, to make a favorable impression upon the jury. They evidently took the view that, whatever may have been Miller's custom, it was not only unusual, but theretofore unheard of, for a man to purchase calves at such a time and at such a place, and unbelievable that an honest man would do so. Miller testified that when he passed the pit and drove a considerable distance beyond, he did so "inadvertently." But as the pit was directly across the road from Miller's home and there was a bridge crossing

the road at that place, which naturally would attract attention, the jury might well have considered that explanation as incredible, and concluded that Miller drove past the pit in order to assure himself that the road was clear of travelers who might interfere with his criminal purpose to participate in the theft of his neighbor's calves.

Our attention is called to *Graff v. People,* 65 Colo. 489, 177 Pac. 962. But in that case the showing made was free from the infirmities that are present in the showing in this case. The newly discovered evidence in that case was not recanting evidence, nor was it merely impeaching evidence, but was strong substantive evidence tending to show that the crime was committed, not by the defendant, but by the principal witness for the people.

 Counsel for Miller quotes the following language in the opinion in *Whipp v. People,* 78 Colo. 134, 138, 241 Pac. 534: "* * * if the newly discovered evidence is of such a character as to make it appear that the verdict was probably influenced by false testimony and that upon another trial the result would probably or might be different, or even doubtful, then a new trial should be ordered." In one respect, that language went beyond the requirements of that case and stated the rule too broadly. It is not the law that a new trial "should" be ordered if the newly discovered evidence is of such a character as to make it appear that upon another trial the result "might be different, or even doubtful." Ordinarily, a motion for a new trial based on the ground of newly discovered evidence is regarded by courts with disfavor. *Ives v. People, supra; Edwards v. People, supra; Blass v. People, supra; Eachus v. People,* 77 Colo. 445, 236 Pac. 1009. And to sustain such a motion, the court should be satisfied that, because of the newly discovered evidence, it is probable that the result would be different. *Ives v. People, supra; Edwards v. People, supra; Lowell v. Hessey,* 46 Colo. 517, 105 Pac. 870. Where, as in the case at bar, the newly discovered evidence goes only to impeach the credit of a witness, we said, in *Beals v. Cone,*

*supra*, that it is not sufficient ground for a new trial, unless it is "clear" that such impeachment would result in a different verdict. From the opinion in *Colorado Springs & I. Ry. Co. v. Fogelsong, supra,* it would seem that newly discovered impeaching evidence would not warrant a new trial, unless it "clearly appears that it would probably change the result in case of a new trial." In our opinion, this is the correct rule.

We cannot say that the trial court abused its discretion in denying the motion for a new trial on the ground of such newly discovered evidence.

2. The contention that Miller's arrest and conviction were brought about by what counsel calls a "frameup," that is to say, a conspiracy between "a certain law-enforcing official" and others, to have the crime perpetrated and to connect Miller therewith, is devoid of merit. The affidavits presented to the trial court in support of the application for a new trial on this ground were wholly insufficient to entitle them to serious consideration.

3. It is said that counsel (not Mr. Cline) appointed by the court presented the case inefficiently at the trial.

The court did not give a cautionary instruction concerning the testimony of an accomplice, and counsel for Miller did not request such an instruction. It is said that such failure on the part of counsel proves his inefficiency. Such an instruction warns the jury of the danger of convicting a defendant upon the uncorroborated testimony of an accomplice, and that the evidence of an accomplice should be received with caution and regarded with suspicion. But in this case Odell's testimony was amply corroborated by the uncontradicted testimony of other witnesses, and in some important particulars by the testimony of Miller himself. The fact that no other witness testified to the conversation between Miller and Odell, wherein, according to the latter's testimony, it was agreed that the calves should be stolen, does not

mean that Odell's testimony was uncorroborated. Naturally, no third person was present during the conversation. To require corroboration of every part of the testimony of an accomplice would be, to quote Garrow, B., in Tidd's Trial, 33 How. St. Tr. 1483, "unnecessary and absurd." In 5 Jones, Commentaries on Evidence (2d Ed.), section 2218, it is said: "It is generally agreed that the matters in corroboration should relate to some portion of the testimony which is material to the issue, but need not extend to every material fact. * * * The corroborating circumstances should not merely tend to prove that an offense has been committed, but they should tend to identify the defendant as the criminal, or to show his connection with the offense. * * * But as corroboration, it has been held sufficient to show possession by the defendant of the goods alleged to be stolen. * * * Such admissions, declarations or conduct of the defendant as might excite suspicion also serve to corroborate the testimony of accomplices." Referring to the testimony of an accomplice, it is said in 1 R. C. L., p. 168: "That he need not be corroborated in every part of his testimony is obvious, since in such case his evidence would be unnecessary, the case being complete against the accused without it." In 1 Ency. Evidence, p. 109, it is said: "The testimony of an accomplice may be corroborated by proof of the possession of stolen property." See, also, 4 Wigmore, Evidence (2d Ed.), §2059; 1 Wharton, Criminal Evidence (10th Ed.), §442.

█ In the circumstances, the fact that Miller's counsel did not request an instruction on the testimony of accomplices does not prove counsel's inefficiency within the meaning of the rule invoked by Miller's present counsel.

As another evidence of inefficiency, it is said that counsel's conferences with Miller before the trial were few and brief. In view of the fact that Miller admitted his presence at the pit around midnight, and that at that time and place the calves were transferred to Miller's truck by Odell, Miller and an ex-convict, and in view of the

further fact that Miller claimed, as his only defense, that that transaction constituted a purchase, which, he said, was consummated in a manner not unusual with him, we cannot say that often-repeated and long-extended conferences with Miller probably would have resulted in a verdict more satisfactory to Miller.

There are other instances of what are claimed to be evidence of inefficiency, but they, either separately or in connection with those just discussed, fall short of the showing necessary to justify the reversal of the judgment.

In *Mandell v. People,* 76 Colo. 296, 304, 231 Pac. 199, we said: "As a general rule mistakes of counsel are imputed to his client even in criminal cases. Doubtless there are some exceptions to this rule. * * * There may be extreme cases where the ignorance or dishonesty of counsel is so palpable that relief may be awarded in a motion of this nature but it cannot be given here." Nor can it be given in the present case, for the facts do not warrant it. The court appointed counsel selected by Miller himself. The one so appointed has been a member of the bar for many years, is experienced in the trial of cases, both civil and criminal, and the trial court found that appointed counsel did not try the case inefficiently. His omissions, such as they were, were not of such character as to warrant a reversal of the judgment.

4. It is contended that the court erred in not giving, on its own motion, certain instructions.

(a) No cautionary instruction on the testimony of accomplices was requested, and the court did not give one on its own motion. In the circumstances, this was not reversible error.

(b) It is said that the court did not instruct on the burden of proof. The court, after stating the material allegations in the information, gave this instruction: "The law presumes the accused to be innocent of the charge, and before you can convict the defendant the evidence must establish every material fact alleged in the

information beyond a reasonable doubt. If the evidence or lack of evidence upon any of said material facts leaves in your mind a reasonable doubt thereof, it will be your duty to return a verdict of not guilty. * * * you are not to find the defendant guilty if you entertain a reasonable doubt of such guilt," etc. That covered the question of burden of proof sufficiently to answer counsel's objection.

5. Counsel for Miller contends that certain instructions given by the court were erroneous. No objections thereto were made below; nevertheless, we will consider them.

(a) It is contended that one instruction casts upon Miller the burden of explaining his recent possession of the stolen property, and comes within the ruling in *Van Straaten v. People*, 26 Colo. 184, 56 Pac. 905, which, it is said, holds such an instruction to be erroneous. The objectionable features of the instruction in that case are absent from the instruction in the case at bar. There, the jury were told, substantially, that recent possession of stolen property is a "strong criminating circumstance" tending to show that the possessors were guilty of stealing the same, unless the facts and circumstances "satisfy" the jury that the defendants came into possession honestly; and that if stolen property recently was found in the exclusive possession of the defendants, then this, "in law," would be a circumstance tending "strongly" to show that the defendants stole the property, unless the facts and circumstances in evidence "show" that they came into possession honestly. The instruction now before us is entirely different. In it, the jury are told that should the defendant fail to satisfactorily explain his recent possession of the property the jury "may" find him guilty, "provided the evidence in other respects warrants such finding;" and that if the jury believed from the evidence that the conduct of the defendant was inconsistent with innocence, it was incumbent upon the defendant to satisfactorily explain

such conduct, and if he failed to do so the "jury may draw such conclusions from the defendant's conduct as a reasonable and prudent man would draw in the light of such knowledge and experience as is common and general to mankind." The very expression "recent possession unexplained," occurring in the rule under consideration, indicates that such recent possession requires some explanation. It is not necessary that the explanation should be satisfactory to the jury; if it raises in their minds a reasonable doubt of the defendant's guilt, it is sufficient to require an acquittal. In other instructions—and all instructions must be taken together—the court made it plain that if the evidence or lack of evidence upon any of the material facts left in the minds of the jury any reasonable doubt of Miller's guilt, it was the jury's duty to return a verdict of not guilty. The explanation offered by Miller was of such a character that the jury might well have considered it incredible, and no doubt they did so consider it. While the instruction in question cannot be regarded as a model, it does not come within the ruling in the Van Straaten case, supra, and giving it was not reversible error.

(b) The court instructed the jury that in determining the guilt or innocence of Miller, they had a right to take into consideration the manner in which he came into possession of the property—the time, place and all surrounding circumstances, etc. *Lowe v. People,* 76 Colo. 603, 234 Pac. 169, is relied upon to sustain the contention that such an instruction is improper in that it calls attention to certain circumstances in evidence. That case is not applicable here. There, the defendant requested the court to instruct the jury that certain circumstances in evidence might be considered by them in determining the question of defendant's guilt or innocence. We held that it was not the trial court's duty to call the jury's attention to all of the salient points in the evidence, and that it was not error to refuse such request.

While the instruction challenged here might well have been omitted, it was not prejudicial error to give it.

6. Complaint is made that the district attorney brought out evidence tending to show that there was another similar charge against Miller, without showing a conviction. On cross-examination of the sheriff, Miller's counsel asked why the sheriff had gone to the pit, and the sheriff said that he had reasons for watching Miller and his truck. Asked whether he had any complaint against Odell, the sheriff said that he had a couple of weeks before. Asked why he knew anything was going to happen there at the pit, he answered: "A. I didn't know for sure that there was, but I can tell you why I picked that place. It is a kind of a place there where on several other occasions I have had occasion to go down there and check up on other stuff. For instance, when the carnival was here this summer, there was a car stolen from up in front of Weaver's Quick Lunch here, taken out into that place and stripped. A little bit above there there's a road where they go in there and have booze parties, and one thing and another. I have business to go in there, have reasons to think that that would be a good inconspicuous place." That was the state of the record when, on redirect examination, the district attorney asked the following questions and the sheriff gave the following answers: "Q. Mr. Yates, you have testified that you observed the movements of Miller's car on the night of the 19th here at Wray? A. Yes. Q. Now was there any other reason for your watching him? A. Yes. Q. What was that? A. Well, that about thirty days before I was supposed to have to serve a warrant on Mr. Miller in another case. Q. Of the same kind and character? A. Yes. Q. And then in addition to the fact that you noticed these unusual movements [in town] that night you did have him under observation? A. Yes, sir." There was no objection to either the questions or the answers. Miller's theory was that the present prosecution was the result of a "frameup," or conspiracy, and

in cross examining the sheriff, Miller's counsel was seeking, no doubt, to support that theory. As he was the first to go into the question of the sheriff's reasons for going to the pit on the night in question, the redirect examination by the district attorney did not, in the circumstances, constitute prejudicial error entitling Miller to a reversal of the judgment.

7. It is suggested that the district attorney drew from the people's witnesses evidence of Miller's failure or refusal to make a statement to the officers after his arrest, and it is said that this course was improper and pernicious. But admittedly Miller, while in custody, did make statements concerning the transaction—not formal, written statements, it is true, but nevertheless statements. At the gravel pit, after his arrest, Miller stated that he bought the calves of Odell. He asked the sheriff if there was any way he could "fix the matter up," stating that if there was anything wrong, he wanted to "fix it up." He wanted to take the calves back to the owner. He asked the sheriff if he could not unload the calves at the sales pavilion or at the sheriff's barn. Asked why he wanted to do that, he stated that people would see them in his truck in the morning and he did not want them in there. On redirect examination, the district attorney asked the sheriff: "Now in regard to the conversations with Mr. Miller that [Miller's attorney] had asked about, did Mr. Miller talk to you freely about the case?" The answer was that he did not. Asked, "Did he refuse to make a statement about it?" he answered, "Yes." There was no objection made to the question. Indeed, it is argued here, as a point in his favor, that Miller made no incriminating statement. The note in 25 L. R. A. (N. S.), 558, relates solely to "uncontradicted statement in presence of accused as confession." It has no application here. In the circumstances, Miller is in no position to complain, and in our opinion the conduct of the district attorney did not tend to prejudice the substantial rights of Miller.

8. It is said that the sentence was for a longer term of imprisonment than the statute permits. The term was from three to five years. The contention is that, according to the evidence for the people, Miller was only an accessory after the fact, and that, under section 6646, Compiled Laws, the term of imprisonment cannot exceed two years. The trouble with this contention is that Miller was not an accessory after the fact, but was a principal and punishable as such. The sentence was not contrary to law.

9. There are other assignments, but evidently counsel does not have much confidence in them. It is sufficient to say that they are without merit.

10. The question of Miller's guilt does not depend wholly upon the nature of the preliminary conversation between Miller and Odell. The evidence justifies the conclusion that Miller's part in the transaction was more active than that of an accessory before the fact. Section 6719, Compiled Laws, defines larceny as "the felonious stealing, taking and carrying, leading, riding or driving away the personal goods or chattels of another." Miller and Odell were caught in the very act of carrying away the chattels of another. Odell confessed the felonious character of the transaction, whereas Miller denied that his participation was felonious. Although Miller did not actually go with Odell into their neighbor's pasture to get the calves, he waited in a secluded place off the road to take the calves and carry them away in his truck, and was caught in the very act of doing so. The evidence satisfies us, as it did the jury, that Miller and Odell were cooperating in stealing the calves, each performing his agreed part in the transaction, and that they are equally guilty. That the calves were stolen was proved, not only by the testimony of Odell, but by the testimony of the owner. If all of Odell's testimony were eliminated, enough would remain to prove the theft of the cattle by Odell and Miller.

Neither the jury nor the trial judge entertained any

reasonable doubt of Miller's guilt; nor do we have any such doubt. Miller was tried fairly, convicted fairly, and received a just sentence. The record discloses no reversible error.

The judgment is affirmed.

MR. JUSTICE BOUCK and MR. JUSTICE HILLIARD dissent.

MR. JUSTICE BOUCK, dissenting.

From the judgment of affirmance I dissent.

The single issue in the case at bar, as I view it, lies in the question: Has the defendant, Miller, plaintiff in error here, had the fair and impartial trial guaranteed him by the Constitution of the United States and by the Constitution and laws of Colorado? We may discuss this particular error and that, yet, when all is said and done, we come back to the fundamental question just stated.

Our court, by adopting rule 35 (*"Counsel will be confined to a discussion of the errors stated, but the court may, in its discretion, notice any other error appearing of record,"* 85 Colo. xxiv, 35), has on its own initiative established in the interest of justice a procedure which in some states has evidently required a direct legislative mandate. This is true in Iowa, for instance. Iowa Code (1897), §5462. "And we can and should reverse a criminal case where it appears on the record that defendant has not had a fair trial, even though no specific error of law in the rulings of the court has been properly preserved." *State v. Barr,* 123 Ia. 139, 142, 98 N. W. 595. I believe our rule 35 ought to be applied in this case, where a young man in his early twenties, without a previous criminal record, has been branded as a felon.

One of the basic complaints here is the very fact that Miller's trial attorney, contrary to the Colorado practice, failed to object when objections ought to have been made. Hence it seems specially fitting to disregard here the absence of objections and exceptions. Therefore I have searched the whole record with a view to ascertaining whether the trial has been fair.

Miller, the defendant, was convicted of the larceny of a calf and received a penitentiary sentence of not more than five or less than three years. Apart from the testimony of Earl M. Odell, who claimed to be an accomplice, there was no material evidence which under recognized rules connects Miller with the larceny; nothing in fact but bare suspicion.

After verdict and before sentence the attorney for Miller, who had been assigned by the trial court to defend the indigent defendant, filed a motion for a new trial that was submitted without argument and denied.

After sentence the trial court duly granted Miller leave to file an amended and supplemental motion for a new trial. It was prepared and filed by another attorney, who represents Miller in this court. Two of the additional grounds therein stated are, first, that the assigned attorney was inefficient in conducting Miller's defense, and, secondly, that there is newly discovered evidence.

This motion was fortified by ten affidavits, which stand unquestioned. Not a single counter-affidavit or evidence of any kind was offered in contradiction on behalf of the people.

The amended and supplemental motion for a new trial, so supported, was argued and denied, Miller's exception being duly saved. I think that the ruling was, according to the overwhelming weight of authority, prejudicial error, and that a new trial ought to have been granted by the lower court. After eliminating from the supporting affidavits everything which is hearsay or mere opinion or otherwise insufficient or inadmissible, I am convinced that enough remains to establish clearly the two grounds mentioned, which ought to render unnecessary any consideration of the others. The first of these two grounds will be dealt with first; the second one, as to newly discovered evidence, will receive attention later.

As to *inefficiency of defendant's assigned attorney*. The uncontradicted affidavit of Pierce Miller, father of the defendant, confirmed by an inspection of the record

herein, alleges that "no instruction was tendered upon the weight of evidence of an accomplice." The uncontradicted affidavit of the defendant himself says that the assigned attorney "did not confer with affiant at any length or to any degree whatever before the day of the trial" and that on the latter day, "prior to the beginning of said trial, said counsel conferred with affiant, not to exceed thirty or forty-five minutes."

The practice of giving the accomplice instruction referred to in the Pierce Miller affidavit has long been imbedded in Colorado criminal procedure, as I shall show. Thereunder it becomes the duty of our trial courts to give, and of defendants' attorneys to see that there is given, a cautionary instruction whenever the testimony of an alleged accomplice is received, and I consider such an instruction absolutely essential to a fair trial. I am convinced that, in a case where such testimony is corroborated only slightly or not at all (and I believe the same would be true of most cases where substantial corroboration exists), the failure to give such an instruction ought to be held prejudicial error regardless of whether there has been inefficiency or negligence on the part of an attorney. But, aside from that, "It is the duty of defendant's counsel to follow the proper practice in conducting the defense." 16 C. J., p. 887, §2221. Not only so; that duty rests with peculiar weight upon counsel assigned to defend an indigent defendant. By our rule 83e this court has formally adopted the following canon of ethics promulgated by the American Bar Association: "A lawyer assigned as counsel for an indigent prisoner * * * should always exert his best efforts in his behalf." Am. Bar Ass'n Report, 1932, p. 844, canon 4; Colo. Sup. Ct. Rules (1929), p. 51. This is in effect a statement of the substantive law. Counsel's not seeing to it that a cautionary instruction was given herein—in the face of what has been the proper practice—surely demonstrates in and of itself the attorney's inefficiency under the facts of this case. I reiterate: under the best authorities, the court's

omission is itself to be deemed prejudicial and reversible error. Be that as it may, this particular inefficiency of counsel should, in my judgment, be so regarded. The portion of the defendant's own affidavit quoted above seems to put the whole matter of negligence in this instance beyond doubt, since we may well take judicial notice that no lawyer can plausibly claim to be using the requisite diligence when he pays no more attention to an impending felony trial, which has been placed in his charge as assigned counsel, than appears by that affidavit.

Just what, then, is the law on the giving of a proper *cautionary accomplice instruction* in circumstances like those here appearing in evidence? And what is the effect of omitting it?

Colorado's attitude is clear, from the old territorial days down. As expressed by Mr. Justice Campbell: "The [lower] court properly instructed the jury to receive such testimony [of an accomplice] with great caution. Our decisions, ever since the Solander case, are to the effect that one may be convicted upon the uncorroborated testimony of an accomplice, but that it must be clear and convincing, must be received with great caution, and show guilt beyond a reasonable doubt." *Hoffman v. People,* 72 Colo. 552, 560, 212 Pac. 848, 852. See also *People v. Boutcher,* 89 Colo. 497, 503, 509, 4 P. (2d) 910, 912, 914.

Chief Justice Hallett, in the Solander case referred to, declared: "It would seem that where the testimony of an accomplice is not corroborated, the omission to give such advice would constitute error in the record, although no prayer should be presented to the court therefor. *State v. Haney,* 2 Dev. & Bat. [19 N. C.] 396. Where the jury are properly cautioned as to the credit due to an accomplice, a conviction may be had upon his testimony alone, and the verdict will not be disturbed." *Solander v. People,* 2 Colo. 48, 66.

In *O'Brien v. People,* 42 Colo. 40, 42, 94 Pac. 284, Chief Justice Steele said: "The probability is so great that

a witness who admits his own guilt implicates others under a promise, or at least a hope, of immunity, that the jury should be cautioned concerning his testimony. This court has repeatedly held that such an instruction should be given. *Solander v. People,* 2 Colo. 48; *Wisdom v. People,* 11 Colo. 171; *Roberts v. People,* 11 Colo. 219; *Barr v. People,* 30 Colo. 528.''

In *State v. Stebbins,* 29 Conn. 463, cited with approval in the Solander and Wisdom cases, supra, it is said at p. 473: ''* * * the whole extent of the rule is this, that such testimony is of a suspicious character, and calls for scrutiny on the part of the jury, and for a particular caution to the jury on the part of the judge in his charge. The evidence, if standing alone, is not to be rejected, and whether corroborated or not, (and to what degree it needs corroboration the jury must judge), may be sufficient to satisfy the minds of the jury. So important however is it that the jury should be cautioned as to the weight of the evidence by the court, that to omit it is now held a clear omission of judicial duty, and becomes a ground, perhaps, for granting a new trial.''

See also 1 Wharton, Crim. Ev. (10th Ed.), p. 926, §441, cited with approval in the Roberts and Hoffman cases, supra.

Underlying all the well-considered opinions is this reasoning (borne out, I believe, in all our own previous cases) : The testimony of an accomplice is under grave suspicion, hence to convict thereon it must either (1) be substantially corroborated by testimony from an independent and untainted source, or else (2) be in and of itself so clear and convincing as (even without corroboration) to show guilt beyond a reasonable doubt, provided it has been received with great caution; and (3) in either event, whether there is corroboration or not, it is the duty of the court to *warn* the jury to use great caution.

The majority opinion quotes approvingly a brief but striking passage from the ''summing up'' of Garrow, B.,

in the ancient English trial of the traitor, Tidd (1820), 33 How. St. Tr. 1337, 1483. There is, of course, no contention in the case now before us that every part of an accomplice's testimony must be corroborated. Such a requirement would indeed be "unnecessary and absurd." In justice to the learned Baron, however, may I stress the fact that he followed his picturesque phrase with repeated and emphatic warnings to the jury? Id., pages 1483, 1501.

To show that this country and England have evolved the same principles and practice in this connection, I quote from the case of *Rex v. Feigenbaum,* 1 Law Reports (1919), K. B. 431, 433, where Darling, J., speaking for the Court of Criminal Appeal, says: "It is a rule of law that a jury may convict on the uncorroborated evidence of an accomplice * * *. But it has been laid down in many cases that the judge ought not to leave the case to the jury without warning them firmly that the evidence of an accomplice must always be regarded with grave suspicion, and that they ought not to convict unless the evidence of the accomplice is corroborated." The learned Justice expressly approved what the jury were told in the trial below, namely, "that it was for the *jury* to consider whether in their opinion it did, or did not, amount to corroboration, and, if they thought it did, it was for them to say whether they thought there was sufficient evidence on which to convict the appellant."

The most widely used form of instruction in Colorado on the subject of accomplices, long and still the stock instruction regularly used in Denver, as well as in many other judicial districts of the state, is this:

"While you may convict upon the uncorroborated testimony of an accomplice, still you should act upon his testimony with great caution, subjecting it to a careful examination in the light of the other evidence in the case, and you are not to convict upon such testimony alone unless satisfied, after such careful examination, of its truth. If not so satisfied you cannot convict without such cor-

roboration of the same as will convince you beyond a reasonable doubt, and in the absence of such corroboration, your verdict should be not guilty.

"Corroborating evidence means such evidence, either direct or by proof of surrounding facts and circumstances, as tends to establish the participation of the defendant in the commission of the offense."

The majority opinion has inadvertently slipped into a common error in stating that the omitted cautionary instruction "warns the jury that the *uncorroborated* testimony of one who claims to be an accomplice must be received with great caution." As is apparent from the Colorado stock instruction just quoted and the authorities cited, the warning is directed not merely against the uncorroborated testimony, but *all* the testimony, of an accomplice. (Since the majority opinion was handed down, the above error of fact has been corrected; but the erroneous argument based upon that error as a premise still remains, and so is a tacit admission of its own fallacy.)

The problem before the court is rooted in the fundamental principles of jury trials. It is for the jury to say, after due warning, whether the accomplice is corroborated, whether the corroboration is sufficient, and whether the accomplice is to be believed even if uncorroborated. Unless the *jury* have tried the defendant in accordance with the proper procedure, how can we say that the trial was fair?

By not insisting upon a proper cautionary instruction, Miller's assigned counsel enabled the trial court to commit a most serious error, for which, without more, Miller was entitled, I think, to a reversal.

The defendant here, according to all the evidence, was not present at the time and place that Odell, the alleged accomplice, stole the property. There is no corroboration whatever of Odell's statements attempting to implicate Miller in it. Under the theory on which the case was tried below, Miller is charged as a principal and is

to be held, if at all, as an "accessory before the fact," as one "who, not being present, aiding, abetting or assisting, hath advised and encouraged the perpetration of the crime." C. L. '21, p. 1726, §6645. The advising and encouraging thus constitute of course an indispensable element of Miller's alleged offense. On this element there is not an iota of evidence other than Odell's upon which, no matter how suspicious any of the circumstances might seem, it could be predicated—on the record actually before us—that Miller advised or encouraged Odell to steal. Had there been a proper cautionary instruction, then of course—under the unbroken array of our decisions—Odell's testimony, even without corroboration, would have been regularly before the jury, to convict or not to convict thereon as they might see fit. In the absence of such an instruction, I venture the opinion that the jury did not view Odell's testimony with the proper amount of caution and "with grave suspicion."

To take up briefly the topic of *recent possession of stolen property,* regarded from the angle of possible corroboration: In a case of larceny such possession (if not explained) *ordinarily* permits a jury's presumption of fact, or its inference, that the possessor is the thief (while if the prosecution were on a charge of felonious receiving the jury might draw the radically different inference that the possessor received the property with guilty knowledge of the fact that it was stolen). Of course the prosecution of Miller is for larceny, and not for receiving. Therefore the only possible adverse inference that could be drawn from the possession, even theoretically, in this case, it being a larceny case pure and simple, is that Miller was the actual thief, that is, that he was present at the taking; but the uncontradicted evidence shows that Miller was not then present and hence was not the actual thief. "Presumptions are indulged to supply the place of facts; they are never allowed against ascertained and established facts. When

these appear, presumptions disappear." *Lincoln v. French,* 105 U. S. 614, 617, 26 L. Ed. 1190.

"It is recent possession unexplained, that is, without circumstances appearing which indicate that such possession is consistent with defendant's innocence, which constitutes evidence against him. Thus, if it appears that the possession of defendant had its inception subsequently to the time of the commission of the crime, such explanation will obviate the effect of the possession as tending to show criminality." 1 McClain, Crim. Law, p. 626, §618, citing *Heed v. State,* 25 Wis. 421, and *State v. Jackson,* 126 Mo. 521. See also *Gardner v. State,* 84 Tex. Cr. 586, 588, 208 S. W. 920, and *State v. Scott,* 109 Mo. 226, 228, 229, 19 S. W. 89; *State v. Christian,* 253 Mo. 382, 396, 161 S. W. 736.

The "explanation" does not necessarily come from the defendant. In the present case that explanation would be manifest from the people's evidence, even if the defendant Miller had not uttered a word. Miller's possession is consistently "explained" (1) by the facts and circumstances apparent from the people's case; (2) by the statements of Miller made as part of the res gestae at the time of his arrest contemporaneously with his receiving possession; (3) by the testimony of Miller on the witness stand. Under the undisputed facts, it would be absurd to infer a continuous possession of Miller's as relating back to Odell's taking.

"It must be a possession, which the proof disclosing it does not show to have had an origin and inception subsequent to the offense. This was not of that character. On the contrary, the very proof showing it showed its origin and inception." *Heed v. State,* 25 Wis. 421, 423.

And in the case of *State v. Jackson,* 126 Mo. 521, 525, 29 S. W. 601, 602, it was said:

"The usual instructions were given as to burglary and larceny, as to the recent possession of stolen property, * * *. Among the instructions asked for defendant

and refused, was this: 'If the jury believe from the evidence that the defendant came into possession of the watch in question, after the property in question was taken from the house * * * then they 'will find the defendant not guilty.' This instruction should have been given. There was evidence to support it. Under that evidence considered in connection with defendant's extremely suspicious conduct when trying to pawn the watch at Dunn's, the jury might have regarded defendant as the *receiver of stolen goods,* but not as the *thief.* If they did regard defendant as the receiver, then this should have resulted in his acquittal.''

These authorities are not freak decisions. They are a few out of many in line with the lucid declaration of Blackburn, J., made in *Reg. v. Langmead,* Leigh & C. (Eng.) 427, nearly three-quarters of a century ago: "I should have said * * * that, as soon as it was proved that the person in whose possession they [the stolen goods] were found did not steal them, *his possession, if unaccounted for, was evidence that he had received them knowing them to be stolen.''* The case at bar is larceny; there was no attempt to charge, or try for, felonious receiving.

A case reminding us strongly of the case before us is *People v. Fagan,* 98 Cal. 230, 233, 234, 33 Pac. 60, 61, 62, where the court, in reversing a conviction for insufficiency of the evidence to establish a larceny, said: "Evidently appellant did not himself, personally, take the cattle or assist in such taking. He could therefore only be convicted on the ground that though not present he had previously advised and encouraged the theft. * * * That the circumstances raise a very strong suspicion against defendant may be admitted. * * * Not a circumstance is proven, which is not entirely consistent with his innocence of the particular offense with which he is charged. To justify a conviction, one must not only be proven to have committed an offense, but the very offense charged * * *. All the circumstances are consistent with

the supposition that * * * he was simply a receiver of stolen goods, knowing them to have been stolen. Perhaps the evidence would sustain a charge of receiving stolen goods, knowing them to be stolen, but the circumstances are insufficient to show that he had previously to the commission of the offense advised and encouraged its commission."

In nowise opposed to the specific authorities which I have cited are the citations, by the majority opinion, in 5 Jones, Comm. on Ev., 1 Ency. Ev., Wigmore and Wharton. Both the text and the cases there cited deal with the general rule and not with our special situation of admittedly subsequent possession in a larceny case, the distinction between which I have endeavored to make clear.

As to *newly discovered evidence,* the general rule is that courts look with disfavor upon applications for a new trial based on this ground. *Edwards v. People,* 73 Colo. 377, 394, 395, 215 Pac. 855, 862. Nevertheless "Courts will see to it that there is not a miscarriage of justice, and are sometimes indulgent in their requirements as to a showing of newly discovered evidence, if they are impressed with the conviction that there has been a miscarriage of justice, even if the newly discovered evidence be incidentally impeaching in its nature and merely cumulative, when satisfied that there is probable cause that the result would be different as the result of such testimony." Id.

As already indicated, Odell, the self-confessed accomplice, tells with great detail about the larceny, which he claims he committed alone and unaccompanied. The res gestae of the principal crime are fully recounted in his testimony. No one else, he says, was involved in the main transaction. The jury's conclusion as to Miller's alleged role of accessory prior to that transaction must under the stated facts depend wholly upon Odell's unconfirmed tale. Cross-examination is the weapon of truth. Without Odell, or if Odell be discredited, the prosecution would fall; if, in a trial conducted with due regard for

the fundamentals neglected in the trial below, Odell should prove himself sufficiently worthy of belief, the prosecution would prevail. Shall a court say that, in such circumstances, evidence tending to "impeach" this main witness—not collaterally but directly—is anything else than legitimate evidence going to the very root of the entire matter? The defendant, I think, ought to be given the opportunity of a genuine, orderly jury trial to make up for the anomalous proceedings actually had.

The majority opinion lays down a correct rule in saying that the repudiation of Odell could be shown, not as independent evidence, but only if Odell were again placed on the witness stand, and to impeach him by proof of his contradictory statements. Another trial without Odell on the witness stand would be inconceivable; surely no one would contend that the people could make out a prima facie case without Odell's testimony. The one material issue controverted between Odell and Miller is as to Miller's being Odell's accessory. They are pitted one against the other. In the trial below Odell's testimony was directly assailed by Miller alone, and Miller's only by Odell.

Three persons, two of whom were not witnesses at the trial, heard Odell repudiate his testimony in vital respects, not as an affiant volunteering aid to the defendant, but in apparent defiance.

The affidavits before us supply uncontested, newly discovered facts which tend unequivocally to impeach Odell on the one material issue. A partial synopsis of these affidavits is in the note appended to this opinion. The facts therein stated, together with all the various trial errors, especially the disregard of the rules as to the burden of proof, have confirmed my conviction that a miscarriage of justice herein could be avoided only by a new trial.

But it is said that "impeaching" testimony is not sufficient to justify a new trial. I submit that the kind here offered is. The cases cited in the majority opinion—per-

fectly good authorities for a different state of facts—seem to me wholly inapplicable. The Blass and Shilitano cases, for instance, involved formal recantations, with all their weaknesses. The rulings as to new trials were after hearings with sharp clashes of conflicting evidence. Here the proposed evidence stands without a denial. The Quinn and Ives cases, both involving recantations, are wholly unlike ours. The Christ case deals with an attempt at purely collateral impeachment, entirely aside from the merits. Sup. Ct. Lib. Abstr. & Br., vol. 2, case No. 408. The Beals-Cone case relates to an offer of evidence as to a subsequent conviction of felony.

It is proper to note here the view of the trial judge in refusing the new trial. He said: "The purported newly discovered evidence * * * would be * . * * immaterial, *not impeaching* the witness Odell upon a material point, and * * * the alleged evidence and motion come *too late.*" (It will be remembered that the lower court had granted leave to file the motion, and that the evidence was discovered after the trial.) Such was the reasoning of the trial judge, and it is fair to take his viewpoint in order to obtain further light on the psychology of the trial.

The word "impeachment" is indeed suggestive of unnecessary ambiguity. "Impeachment, as heretofore defined by this court, is an attack upon a witness' general reputation for truth and veracity, and *is not, strictly speaking, the effect which is produced upon the credibility of his testimony by proof of contradictory statements made by him upon a matter in issue or relevant thereto.*" *Lenz v. Public Service Ry. Co.,* 98 N. J. L. 849, 851, 121 Atl. 741, 742. (Quoted in 6 Jones, Comm. on Ev. 4718, sec. 2396, note 5.)

In this connection attention is called to *People v. Cotell,* 298 Ill. 207, 217, 131 N. E. 659, 663: "Where the state's case rests, as it does here, upon the truth of the testimony of an accomplice, and newly discovered evidence is offered to prove that in material matters she has

testified falsely, such new evidence goes to the very foundation of the people's case and should be considered by a jury.''

It seems to me it has already been demonstrated that the defendant was denied a fair and impartial trial. However, some of the additional errors pertaining to evidence, instructions and procedure will be mentioned.

In the matter of *evidence,* there were erroneous admissions and exclusions which, alone, would perhaps not require a reversal. A number of these errors were serious. I shall not take time to discuss them, yet I cannot acquiesce in the reasoning of the subdivision numbered 6 in the majority opinion. That reasoning, to my mind, runs counter to wholesome safeguards long established by the courts of this and other jurisdictions. Nor can I leave the subject of the evidence without saying that, reading the testimony of Miller in connection with its context as given in the record, I draw different conclusions from those drawn in subdivision 7 of the opinion. According to my view of this case, the jury, especially because of the errors in giving and refusing instructions, could not, and did not, give the defendant a fair trial. Moreover, I believe that, under the authorities I have cited, a jury is the only proper part of our judicial system to pass in a case like this upon the weight and credibility of the evidence, and the sufficiency of the testimony of the alleged accomplice. Under the majority opinion herein, this court I fear has (doubtless inadvertently) usurped the legitimate functions of the jury.

As regards the *instructions:* The trial court should, of course, instruct fairly on all the legal principles actually involved, and omit instructions on all other matters. It did neither. The omitted cautionary accomplice instruction has been discussed. Likewise missing were the usual instructions on accessories and the people's burden of proof in criminal cases. The skeleton references mentioned in the majority opinion do not make up for the omission of the latter. Such a view would impliedly

charge with inexcusable tautology most of our trial judges, who are careful to give the customary instructions in direct and understandable form. Moreover, any other than a complete burden-of-proof instruction is nullified by the following unique instruction "No. 9" (given herein by the court despite its having no application here, as already explained):

"Where property proven to have been stolen is found shortly after the theft in the possession of the accused, the burden is upon him to satisfactorily explain such possession. Should he fail in such explanation the jury may find him guilty as charged in the information, provided the evidence in other respects warrants such finding.

"In determining the guilt or innocence of the accused, the jury has a right to take into consideration the manner in which the defendant came into possession of the property under investigation in this case, the time when the delivery was made, the place selected for the place of delivery of the animal in question, the manner in which the transaction was carried on, and all surrounding facts and circumstances connected with the defendant's possession of said animal; and if the jury believe from the evidence that the conduct of the defendant in this matter was inconsistent with innocence, it is incumbent upon the defendant to satisfactorily explain such conduct, and if he has failed to do so, the jury may draw such conclusions from the defendant's conduct as a reasonable and prudent man would draw in light of such knowledge and experience as is common and general to mankind."

It is error thus to put the affirmative burden upon a defendant. See *Van Straaten v. People,* 26 Colo. 184, 188, 56 Pac. 905, 907, which cites *Boykin v. People,* 22 Colo. 496; *Babcock v. People,* 13 Colo. 515; *Brooke v. People,* 23 Colo. 375. In its comment on the Van Straaten decision the majority opinion overlooks the fact that this court there condemned *two* objectionable features of the recent-possession instruction in that case, the one re-

ferred to by Mr. Justice Butler (which declared that "in law" the possession is "a strong criminating circumstance," thus creating a presumption of law) and also another (concerning "the burden of satisfying the jury" as to coming into possession honestly), which latter is the objectionable part that parallels a similar one here. It is to this point that the Van Straaten opinion aptly cites the Boykin, Babcock and Brooke cases, supra. See, also, *State v. Manley,* 74 Ia. 561, 562, 38 N. W. 415.

Failure to comment on various other instructions given by the trial court, such as a peculiar instruction, inconsistent with itself, on sufficient proof of ownership, is not to be taken as a tacit approval thereof. A re-reading of the instructions as a whole still leaves on my mind the impression that, in relation to them all, the defendant's rights were forgotten. The record shows that when the time to instruct arrived the trial judge displayed what purported to be a full set of instructions which he had himself prepared. The formal colloquy between judge and counsel as reported negatives any inference that the instructions were ever read by counsel for Miller. Evidently counsel took for granted that all requisite instructions were included by the judge. The principle applied by this court in *White v. People,* 79 Colo. 261, 268, 245 Pac. 349, 352, could and I think should be applied here, under the statement in the opinion there, reversing the judgment, that without specific requests "it was the duty of the court to fully instruct the jury."

Resuming discussion of the alleged inefficiency displayed by defendant's assigned attorney, discussed to some extent at the beginning, I concede of course that an attorney's isolated errors in judgment or tactics, or ordinary lapses of care, skill or diligence will not entitle to a new trial. See *Mandell v. People,* 76 Colo. 296, 231 Pac. 199. The higher court, however, will in proper cases protect one who through no fault of his own has suffered prejudice from the negligence or inefficient conduct of an attorney, especially where the latter has been appointed

by the court to represent him. See 29 Mich. L. Rev. 923-4. The majority opinion remarks: "The court appointed counsel selected by Miller himself." Needless to say, this generosity of the trial judge could not in fairness or justice entail a waiver of the rule which holds assigned counsel more strictly to account than a privately employed attorney whose acts are those of his client because of the pecuniary contract between them. *Carlson v. People,* 91 Colo. 418, 431, 15 P. (2d) 625, 629, citing *People v. Thompson,* 321 Ill. 594, 152 N. E. 516. Ignorance or dishonesty of an attorney may require relief. *Mandell v. People, supra,* at p. 304. So may unprofessional conduct or inefficiency of counsel. Id., at p. 302. It would be strange indeed if relief could be granted in the contingencies specified in the Mandell case, supra, but not where, as here, an attorney of acknowledged professional skill and experience happens to handle the defense of the particular case in a palpably inadequate way. "It is doubtful if any court has refused a new trial where such inadequate representation has been shown to have caused an unfair trial." 29 Mich. L. Rev., supra.

But apart from the exact measure of inefficiency sufficing in itself to justify a reversal, even where objections and exceptions are not properly saved, it is elementary that where the inefficiency has combined, as in the case at bar, with numerous serious errors so as cumulatively to prevent a fair and impartial trial, the conviction ought to be set aside. *White v. People,* 79 Colo. 261, 268, 245 Pac. 349, 352.

Inasmuch as various items of evidence are narrated and interpreted in the majority opinion, I feel it incumbent upon me to set forth in a note appended to this opinion, certain uncontradicted facts and other evidence having a bearing on the discussion, and giving perhaps a more definite background and context.

By way of *summary,* I conclude.

The fate of this young defendant was in the hands of twelve jurors 'whose minds, as they entered their jury

room to deliberate, must have presented a strange situation for a court of law:

1. A self-confessed accomplice has testified as the principal people's witness, yet they have not heard the slightest warning to receive his testimony with caution or suspicion.

2. They have heard not a single word spoken about the desirability or nature of corroboration for accomplices' testimony.

3. The usual stock instruction placing the burden upon the people to prove guilt beyond a reasonable doubt has not been given them, nor, as I believe, any fair equivalent of it.

4. A recent-possession instruction has expressly authorized on their part an inference that the defendant is guilty of larceny, when admittedly he received his possession after the taking and many miles from the scene of it, and so the inference could not lawfully be drawn.

5. The same instruction, thus not justified by the facts, has twice deliberately told them to place upon the defendant the unlawful burden of affirmatively proving his possession to be an honest one, when a defendant—even in a case where recent-possession evidence is admissible, as it was not here—is not required to introduce more evidence than sufficient to raise a reasonable doubt.

6. The stock instruction on criminal accessories, a vital one in a case like this, has been withheld from them, and nothing has taken its place.

7. They have listened to the reading by the trial judge of what purported to be, but fell far short of being, a complete set of instructions, which threw a crushing burden of proof upon the defendant and virtually none upon the people.

This, I believe, is a criminal case wherein "the right of trial by jury" did not "remain inviolate" (Art. II, Colo. Const., §23) and the defendant is "deprived of" his "liberty" "without due process of law" (Id., §25). I also believe that he was prevented from exercising, in

516

the true meaning of the provision, "the right to * * * defend * * * by counsel." (Id., §16.) Our criminal procedure has been devised for the equal protection of the people and the criminal defendant. The trouble is not with the procedure, but with its application. Continued or repeated failure, either unwittingly or at will, to apply that procedure firmly and impartially in a case in our trial courts correspondingly weakens the ability of those courts to bring prompt freedom to the innocent, and swift and sure punishment to the guilty.

For the reasons given which I regret I was unable, on account of the number and importance of the matters discussed, to press into a smaller compass, I dissent from the judgment upholding the conviction herein.*

Mr. Justice Hilliard concurs in this opinion.

*Note to Dissenting Opinion.

Synopsis of Evidence: ·

On a moonlight night, August 19, 1932, the defendant Miller left Wray, the county seat of Yuma county, driving his motor truck along the highway toward the town of Laird, seven miles to the east. After going between three and four miles, he turned around and went back a mile or so, where, leaving the highway, he entered upon a road that led southward to a gravel pit which lay about three-eighths of a mile off the highway, but was a part of the ranch belonging to his father, whose ranch house was north of the highway and distant from the gravel pit over a mile and a quarter by road, and in a bee line about three-quarters of a mile. Arriving near the gravel pit about 11:00 p. m., he parked his car and turned off the lights. About 1:15 a. m., Odell, the people's principal witness, drove up alongside in a Ford coupe, to which was attached a trailer. Odell turned off the lights. Accompanying him was one Verne Aughe. Two calves, their legs tied with ropes, were transferred from the trailer to the truck, Miller cutting the ropes. Miller took a receipt for $8, mentioning two head of calves, from Odell, who, after he had, without giving any reason, objected to signing his own name, did so, Miller stating that if Odell did not sign the receipt he would not take the calves. In the presence *and hearing* of Aughe this receipt was discussed and delivered, Miller paying Odell $6 in cash which made $8 with $2 paid Odell at Wray (where Odell hunted up Miller between 7:30 and 8:30 o'clock that evening, very shortly after Miller had returned from a sale which the latter attended in Wauneta, Neb., bringing back on his motor truck a load of hogs and a steer, which livestock he had bought and paid for.)

*All the above is conclusively proved, admitted by both people and defendant.* Here comes the cleavage between Odell and Miller.

Odell claims there was a conversation at Laird on August 16 or 17, two or three days before the meeting in Wray, and that Miller then asked him to go to the pasture *adjoining Odell's father's land* and steal two calves. Miller denies any such conversation, and shows that he was not in Laird on either of those days. Odell is not corroborated on any part of the story about that alleged meeting.

Miller declares that the only talk he previously had with Odell about calves was approximately a month before the arrest, when he, Odell and two or three other boys were in Laird talking "just like a bunch of kids will," and discussing the matter of making money by buying and raising cattle. *Odell does not deny this.*

Miller further says Odell told him at Wray on the evening of August 19 he had two calves that he wanted to sell Miller, and that this was the first

talk relating to these calves while Odell says that in the Wray conversation of the 19th he informed Miller that he "had his two calves ready for him," and that he "had caught these two calves and they was ready for him to go and get." No third person was present, and so it is one boy's word against the other's.

Miller reports Odell's saying that "he was trying to build up a little herd, was trying to get some little calves to build up a herd," and that Odell said "every $3 or $4 he could get a hold of he wanted to get a little calf and take it out to his Dad's and have it grow up" and that he, Miller, "actually thought he had some cattle;" these statements being in the conversation referred to as having taken place about a month before the arrest. *Odell does not deny this.*

Miller asserts that Odell owed him $12, that the purchase price of the calves was twenty dollars (subject to rectification if the estimated weight of 500 or 525 pounds were substantially off either way), and that the $8 paid in cash represented the balance due Odell on the calves. (Miller's counsel tried in vain to introduce certain alleged testimony of a disinterested witness as to a statement by Odell about a $12 transaction between himself and Miller, in corroboration of Miller's version of the purchase price.)

Miller also says he asked Odell to leave the calves at the sale barn in Wray or up at Miller's father's place, and Odell announced he would rather take them to the gravel pit. *Odell does not deny this.*

Miller testifies that Odell, when leaving to get the calves, said, "Archie, it may be a little later, maybe 11 o'clock or 12. Will you be there?" and that Miller replied "Yes, I will drive down there and go to sleep, and I will be there if it's morning," and that Odell's final words were "I will be there 11:30 or 12 o'clock. *Odell does not deny this* except to say his first agreement was to be at the gravel pit at 12 o'clock and his next agreement to be there at 1:00 a. m.

At the time of the arrest, immediately after the calves were transferred from the coupe to the truck, and at all other times in court or out, Miller's explanation was the same: he claimed to have bought the calves from Odell in good faith, and he voluntarily told of the Odell receipt to substantiate his claim.

I recall no evidence of a self-contradiction or inconsistent statement of Miller's. When confronted in court with the receipt and asked why he had not made it read $20, he said: "Well, I possibly should have made the receipt say 'balance of $8 on the calves,' but I just didn't. I just wrote it out. We were in a hurry, he was in a hurry to go, and I was in a hurry to eat supper." (Even in a civil case a party would be allowed to explain or even contradict a receipt.)

Miller testified that Odell said the calves were at Odell's "Dad's;" that Odell asked Miller to get them; that Miller told Odell that he was tired, had had no supper, and absolutely was not going to get them. *Odell does not deny these statements,* except possibly the first.

Odell, when arrested, first denied having had anything to do with the calves, then admitted stealing the smaller of the two calves, then (reminded of the cut ropes which were recovered at Miller's insistent request) he admitted stealing both.

If there is in the record any corroboration of Odell's testimony as to Miller's connection with the larceny, by either Miller or any other witness, I do not recall it.

We have in this case, then, a people's witness, Odell, claiming a clandestine meeting with the defendant Miller at Wray for the purpose of carrying out a corrupt agreement between them to steal some calves. Odell leaves in a Ford coupe to get them. Miller's truck follows along the highway later on. After him comes an automobile carrying the sheriff, his son (who drives) and two deputies. Miller goes on by the point where the branch road leaves the highway for the gravel pit. The sheriff's car, however, turns off and goes to the gravel pit. The sheriff and his deputies get out. The sheriff's son drives the car back upon the highway and returns to Wray, leaving the officers marooned on foot. They wait. Miller's truck enters, and *in accordance with the suggestion of Odell* he awaits the latter, who comes at 1 or 1:15 a. m. The officers are rewarded. The arrest ensues. The sheriff's son returns to the scene, arriving just in time to pick up his passengers and return them to Wray. In the light of the record I cannot but feel that somebody revealed the Odell plan to the officers in advance; if so, one cannot resist the temptation of thinking that the time and place of delivery of the calves were purposely arranged by Odell with a view to the dramatic arrest. The "frame-up" charged seems not altogether mythical.

*Synopsis of Affidavits in Support of Amended and Supplemental Motion for a New Trial:*

*Among the uncontradicted facts gleaned from the affidavits* are the following: (1) Laura Miller, mother of the defendant, being in the jail lobby after Miller's sentence without the knowledge of either the son or Odell, overheard a conversation between them in which Odell admitted testifying falsely in order to carry out an agreement by which he was to receive leniency if he implicated Miller. (*Affidavit of Laura Miller.*) (2) Miller, the defendant, had a conversation with Odell after Miller's sentence in which Odell made substantially the same statement as reported by the mother. (*Affidavit of Defendant.*) (3) Ray Bell soon after Miller's sentence had a conversation with Odell in the jail wherein Odell made substantially the same statement as reported by Miller and his mother; furthermore, Odell said in the same conversation that Miller had nothing to do with stealing the calves but was merely going to buy them, and Odell in this same conversation said that one Aughe was with him in the Odell car when Odell went up from Laird to bring down the two stolen calves (*that is, from a pasture admitted to adjoin land of Odell's father,* where Odell claims to have caught, tied and left the calves.) (*Affidavit of Ray Bell.*) Other affidavits bore on matters that need not be gone into in detail, some presenting facts which would also tend to impeach Odell, and some which would likewise tend to impeach Aughe in the event that the latter should testify at another trial and attempt to corroborate Odell. One of these was to the effect that Aughe displayed a check of the sheriff's payable to him. In passing, it may be mentioned that Odell testified to Aughe's being where Aughe could hear the conversation had between Miller and Odell when the latter delivered the calves *near a gravel pit (admitted to be on the land of Miller's father* in the immediate vicinity of, and across the main highway from, the latter's home, where Miller himself lived.) The distance between the gravel pit and the place where the calves were stolen by Odell is shown by the evidence to be *nearly sixteen miles, if not more.* Even in the wide expanses of Yuma County, this would hardly make the owner of the calves a "neighbor" of Miller, as the majority opinion has it.