The PEOPLE of the State of
Colorado, Petitioner,

v.

Santos ROMERO, Jr., Respondent.

Santos ROMERO, Jr., Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

Nos. 85SC382, 85SC389.

Supreme Court of Colorado,
En Banc.

Nov. 9, 1987.

Rehearing Denied Dec. 14, 1987.

**1004**

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Maureen Phelan, Asst. Atty. Gen., Denver, for the People.

David F. Vela, Colorado State Public Defender, Rachel A. Bellis, Deputy Public Defender, Denver, for Santos Romero, Jr.

QUINN, Chief Justice.

We granted certiorari to review the decision of the court of appeals in *People v. Romero*, 712 P.2d 1081 (Colo.App.1985), which reversed the conviction of Santos Romero, Jr., (defendant) for felony murder and conspiracy to commit second degree sexual assault on the ground that the defendant had received a grant of transactional immunity which barred prosecution

for all these offenses. We conclude that the court of appeals erred in resolving the immunity issue. In regard to other issues not addressed by the court of appeals, we hold that the trial court properly allowed witnesses who had been hypnotized to testify at trial to the full range of their recollections after first ascertaining that their testimony was reliable and that the record supports the trial court's determination that the defendant himself had not been hypnotized. We accordingly reverse the judgment of the court of appeals.

## I.

The charges against the defendant arose out of the murder of two sisters, Rosemary Mata and Julia Mata Delossantos, in April of 1978. On the morning of April 29, 1978, the bodies of the two young women were discovered in a canyon near Fort Collins, Colorado. Near the bodies law enforcement officers found a large rock stained with blood. An autopsy indicated that the women died from blows to the head inflicted by a heavy, blunt object.

At first there were no suspects, and the investigation of the case continued for three years. In November 1978, law enforcement officers learned that the defendant might know something about the homicides. Several officers accordingly met informally with the defendant on December 19. The defendant at this time told the officers that his brother, Porfirio Romero, and Joe Salas had taken the Mata sisters to the canyon with the intent of knocking them unconscious and raping them, and that his brother later told him that they hit the women too hard and killed them. The defendant at this time offered to participate in another interview at which he would be hypnotized in order to help him better remember the events in question.

On December 23, 1978, the second interview took place. This interview was attended by the defendant, his friend Gordon Cruz, sheriff's officers, an investigator from the Larimer County District Attorney's office, and the director of the Larimer County Community Corrections, who was to perform the hypnosis. When the defendant and Cruz expressed concerns about whether any of the defendant's statements made under hypnosis might later be used against the defendant, the officers told him that anything he said under hypnosis would not be used against him, and that they would not prosecute him for "passive involvement" in the Mata homicides. The district attorney's investigator then drafted the following agreement, which was signed by the defendant, the other officers, and the community corrections director:

> In agreement with the Larimer county District Attorneys office and the Larimer county sheriffs office, we here by [sic] agree to grant immunity to Santos Romero in reguards [sic] to his passive involvement in the Mata Homicide.

After the document was executed, hypnotic techniques were used in interviewing the defendant on that occasion and again on January 4, 1979. The defendant made no statements incriminating himself in the homicide at these sessions, but in the months that followed he made various inculpatory statements about the homicides to law enforcement officers, friends, and his ex-wife.

Law enforcement officers also used hypnotic techniques in interviewing other possible witnesses to events preceding the homicide. These witnesses were Cecelia Bieber and Dennis Showalter, a Fort Collins police officer. Both witnesses had been in the vicinity of the Northern Hotel in Fort Collins, where the Mata sisters were last seen alive on the evening of April 28–29, 1978. Three days after the homicide, Bieber informed a sheriff's officer that she had seen the sisters leave the hotel with a man about six feet one inch tall, dark complexioned, with a two inch Afro hair style, and with an Arabic appearance. After being hypnotized in March 1981, she gave the law enforcement officers basically the same description as previously and for the first time identified the man to the officers as Joe Salas.

Officer Showalter had been at the hotel several times on the night of April 28–29, 1978, to investigate disturbances and to

break up fights. His initial report of these incidents did not mention the defendant, his brother Porfirio, Joe Salas, or the Mata sisters, but he later told officers investigating the homicide that he had seen these individuals at the hotel during the evening. After being hypnotized, Officer Showalter was able to provide the investigating officers with further details of his observations.

The defendant was eventually arrested and was charged in the Larimer County District Court with two counts of first degree felony murder and one count of conspiracy to commit second degree sexual assault. Porfirio Romero and Joe Salas were also charged in connection with the Mata homicides, but were tried separately.

Prior to his trial the defendant moved to dismiss the charges, claiming that he had been granted immunity from prosecution by the agreement of December 23, 1978. During a hearing on the motion, a sheriff's investigator testified that prior to the commencement of the hypnosis session on December 23, 1978, the defendant was told that "passive involvement" meant that he would not be prosecuted if he was present at the scene without any knowledge that the crime was happening, or if he gained knowledge only after the homicides occurred, or if he had knowledge of the crime "from the source" but did not disclose such information to the authorities. The defendant, in contrast, testified that his understanding of the agreement was that he was to have "immunity for anything that was done in the homicide as far as actual killing of the girls." The trial court denied the motion to dismiss, concluding that the December 23 agreement did not amount to either a statutory or "common-law" contractual grant of immunity from prosecution whereby the defendant would not be prosecuted for *any* degree of involvement of the homicides. With respect to statements made by the defendant during the hypnosis sessions, the court ruled that the scope of the agreement between the law enforcement officers and the defendant was that any statements of the defendant during the hypnosis sessions "could not be used against him in regard to any active

involvement [in the homicides] upon his part." The district court accordingly suppressed any statements made by the defendant during the hypnosis sessions.

The defendant also filed a pretrial motion requesting that all witnesses who had been hypnotized during the investigation be limited to their prehypnotic recollections and that their testimony be preceded by cautionary instructions to the jury. Porfirio Romero and Joe Salas filed a motion requesting the court to bar or exclude the testimony of hypnotized witnesses on the ground that the hypnosis had rendered the witnesses incompetent. The court conducted a hearing on both motions and heard the testimony of the witnesses who had undergone hypnosis, the persons who had performed the hypnosis, and experts in the field of forensic hypnosis.

Cecelia Bieber, one of the witnesses who underwent hypnosis, testified that, although immediately after the homicide she was not able to name the man she saw leaving the Northern Hotel with the Mata sisters on the night of April 28–29, 1978, she was now able to identify that man as Joe Salas. The reason for her delayed awareness of Salas' identity, according to Bieber, was that she first met Salas in May 1979, and although she first remembered his name when she was in Iowa in 1979, she did not mention his name to the officers until a hypnosis session conducted in March 1981. Officer Dennis Showalter testified that he saw the defendant and Salas at the hotel on the evening of April 28–29, 1978, and gave that information to the investigating officers well before the hypnosis session, which was undertaken only to help him recall any further details of that evening.

The trial court found that the evidence did not support a conclusion that the defendant was actually in an altered hypnotic state during the hypnosis sessions on December 23, 1978, and January 4, 1979, and concluded that any statements made by the defendant to others after the hypnosis sessions were not rendered inadmissible as the unreliable and corrupted products of the hypnosis sessions. The court also conclud-

ed that, notwithstanding the hypnosis performed on the other witnesses, these witnesses understood the nature and obligation of the oath and were capable of accurately recollecting and narrating the facts at trial, and that the prior hypnosis sessions, while properly bearing on the witnesses' credibility, did not render the witnesses incompetent to testify.

The defendant went to trial on January 18, 1982. The prosecution's case consisted of evidence much beyond that elicited from witnesses who had been hypnotized.[1] As pertinent to the issues raised here, however, the prosecution elicited testimony in their case-in-chief from Cecelia Bieber and Officer Showalter. Bieber identified the man she saw leaving the hotel with the Mata sisters as Joe Salas, and Officer Showalter testified that the defendant was with Porfirio Romero and Joe Salas at the hotel on the night in question. The prosecution also presented evidence of several incriminating statements made by the defendant to others subsequent to the hypnosis sessions of December 23, 1978, and January 4, 1979. The jury ultimately found the defendant guilty of two counts of felony murder and one count of conspiracy to commit sexual assault in the second degree. The trial court sentenced the defendant to concurrent life sentences for the felony murder convictions and to an inde-

terminate term not to exceed ten years for the conspiracy conviction.

The defendant appealed to the court of appeals, which reversed the judgment of conviction and ordered the district court to discharge the defendant. *People v. Romero,* 712 P.2d 1081 (Colo.App.1985). Noting that the agreement of December 23, 1978, was intended as a grant of immunity for some level of culpable conduct on the part of the defendant, the court of appeals concluded that, in light of the ambiguities in the document and the difficulty in ascertaining the conduct immunized, the agreement must be construed as a grant of transactional immunity, which precluded prosecution of the defendant for his participation in the crimes. Because of its disposition of the immunity issue, the court of appeals did not address the defendant's other claims relating to the admissibility of the trial testimony of the hypnotized witnesses and the admissibility of the defendant's incriminating statements to others subsequent to the hypnosis sessions in which he participated.

Both the People and the defendant petitioned this court for a writ of certiorari, and we granted certiorari on the following issues: (1) whether the court of appeals correctly determined the effect and scope of the purported immunity granted to the defendant; (2) whether the trial court properly admitted posthypnotic recollections of

---

1. The prosecution's evidence included an analysis of a hair with characteristics similar to the defendant's found near the bodies; John Martinez's testimony that the defendant had told him that "they were going to go rape some chicks," and that the defendant later told him, "We just raped and killed some girls up in the mountains"; Joe Martinez's testimony that the defendant and others had said that "they wanted to rape [the Mata sisters]," and had asked if he "wanted to help them . . ., be a part of it," that the defendant had asked him for advice about how to dispose of bodies which the defendant later identified as the Mata sisters, that the defendant asked him to get his (the defendant's) car from where it had been left because he "was afraid to go get it," and that the defendant "had some scratches on his chest, real deep scratches" the day following the murders; testimony from several witnesses concerning the defendant's attempts the morning after the murders to borrow plastic trash bags; Shirley Baca's testimony that the defendant had told her that he

was present at or near the scene of the murders, that he had hit one of the Mata sisters with a small statue, that he had ripped the bra and panties from Rosemary's body, intending to have sexual contact with her, and that the reason he had been sickened when he used the trash can at his residence shortly after the murders was because bloody trash bags from the murder were in the trash can; Sergeant Phillip Wilson's testimony that the defendant admitted to him during an interview that he was a participant in the planning to rape and the raping of the Mata sisters, that he participated in transporting the victims to the mountains, that he was involved in a discussion about disposing of the bodies, that there was a scuffle with the victims, that he dragged Rosemary's body across the road, that he ripped her clothing off her body, and that he washed blood from his hands in the creek near the murder site, and, that during the interview, the defendant underwent severe physical reactions whenever pressed about who had actually killed the Mata sisters.

witnesses at trial; and (3) whether the trial court's determination that the defendant had not been hypnotized was supported by evidence in the record. We address each of these issues in turn.

## II.

█ In light of the oral representations made by the law enforcement officials to the defendant that his statements during the hypnosis sessions would not be used against him, the People do not contest the trial court's suppression of those statements. Rather, the People raise several alternative arguments directed to the court of appeals' interpretation and enforcement of the December 23 written agreement, which purported to grant the defendant "immunity ... in reguards [sic] to his passive involvement in the Mata Homicide." First, the People claim that the court of appeals erred in concluding that the defendant was entitled to transactional immunity because, in the People's view, the defendant's involvement in the crimes was not the "passive involvement" contemplated by the agreement. Alternatively, the People assert that the defendant failed to take any detrimental action in reliance on the agreement and, hence, the agreement is unenforceable. Last, the People argue that the remedy of dismissal adopted by the court of appeals was far too drastic and failed to consider the legitimate interests of the state. We conclude that there were enforceable agreements between the defendant and governmental authorities, but, in contrast to the construction adopted by the court of appeals, we interpret the agreements as a governmental promise not to prosecute the defendant for the crime of accessory and a further promise of use immunity for any statements made by the defendant during the hypnosis sessions. In light of this interpretation, we are satisfied that the defendant received the complete remedy to which he was entitled by the state's not prosecuting the defendant for his "passive involvement" in the crimes and by the trial court's suppression of statements made by the defendant at the hypnosis sessions.

## A.

Although section 13–90–118, 6 C.R.S. (1986 Supp.), authorizes a district attorney, attorney general, or special prosecutor to petition a district court for an order granting a person use immunity in exchange for the person's testimony in a judicial proceeding, this statute is not the only source for enforcing a governmental promise of immunity. Our decisions expressly recognize that, even though the statutory immunity provisions of section 13–90–118 are not followed, a state may nonetheless be bound by a promise of immunity made to a defendant by a governmental agent possessing the apparent authority to bind the government. E.g., *People v. Manning*, 672 P.2d 499 (Colo.1983); *People v. Fisher*, 657 P.2d 922 (Colo.1983). We made the following observations in *Manning* with respect to "apparent authority":

> The *Restatement (Second) of Agency* § 8 (1958) defines "apparent authority" as "the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." This type of authority is created "as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Id.* § 27. When an agent acts "within his apparent authority" and contracts on behalf of his principal, the principal is liable on the contract. *Id.* § 159.

672 P.2d at 506–07 n. 8. Were it otherwise, governmental officials would be free to extract detrimental concessions from actual or potential defendants and thereafter deny or disaffirm their commitments on which the defendants rely to their substantial detriment. Such governmental conduct would fall far short of according an accused the right to be treated with fairness throughout the criminal process, a right implicit in the concept of due process of law. *E.g., Santobello v. New York*, 404 U.S. 257, 92

S.Ct. 495, 30 L.Ed.2d 427 (1971); *Cooper v. United States,* 594 F.2d 12 (4th Cir.1979); *see also Palermo v. Warden, Green Haven State Prison,* 545 F.2d 286 (2d Cir.1976), *cert. dismissed,* 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *Correale v. United States,* 479 F.2d 944 (1st Cir.1973); *United States v. Carter,* 454 F.2d 426 (4th Cir. 1972), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974); *People v. Reagan,* 395 Mich. 306, 235 N.W.2d 581 (1975). As our prior decisions make clear, the doctrinal basis for enforcing such governmental promises derives from the defendant's constitutional right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and article II, section 25 of the Colorado Constitution. *Manning,* 672 P.2d 499; *Fisher,* 657 P.2d 922.

### B.

The decisive factors to consider in ascertaining the existence and extent of a defendant's right to enforcement of a governmental promise are: whether a promise was made to the defendant by a governmental official with apparent authority to bind the government, and, if such promise was made, the scope of the promise; whether the defendant reasonably and detrimentally relied on the promise by performing his side of the bargain; and, if the defendant reasonably and detrimentally relied on the promise, the appropriate remedy to which the defendant is entitled. *See Manning,* 672 P.2d at 505–09, 512–13; *Fisher,* 657 P.2d at 927–31. Although the promises made in both *Fisher* and *Manning* implicated constitutional rights of the defendants—specifically, their privilege against self-incrimination and their right to effective assistance of counsel, *see Manning,* 672 P.2d at 504; *Fisher,* 657 P.2d at 928—we noted in *Fisher* that the right to enforcement of a governmental promise does not depend upon proof that some independent constitutional right of the accused was impaired or implicated by the promise. 657 P.2d at 927.

■ In determining whether a governmental promise has been made and in ascertaining the scope of any such promise,

it is appropriate for a trial court to consider not only the form and content of any written document purporting to incorporate the government's representations to the defendant but also any oral statements made to the defendant as well as extrinsic evidence relating to the circumstances of the government's dealings with the defendant. *See Manning,* 672 P.2d at 508–09; *Fisher,* 657 P.2d at 929. Consideration of extrinsic evidence is especially appropriate when the written document itself is ambiguous. Under such circumstances, a court's task is not to rewrite the agreement but to construe it in a manner consistent with the intent of the parties and the defendant's right to be treated fairly by the government.

■ In cases where the immunity agreement has been drafted by the government, basic considerations of fairness dictate that any ambiguity as to the scope of the governmental promise be resolved in favor of the defendant. *See State v. Anderson,* 612 P.2d 778, 787 n. 36 (Utah 1980). Construing the agreement in this fashion, however, does not mean that we are free to read into the agreement a benefit that lacks evidentiary support in the record. On the contrary, resolving a governmentally drafted ambiguous agreement in favor of the defendant simply means that, between reasonable alternative interpretations as to the scope of the governmental promise, we will choose the interpretation favoring the defendant so long as that interpretation has a reasonable foundation in the document itself and in the circumstances surrounding its execution.

### C.

■ Applying these general principles to the case before us, we have no difficulty in concluding that the law enforcement officials on December 23, 1978, made both an express oral promise not to use against the defendant any statements which he made during the hypnosis sessions, and a further enforceable written promise over and above the oral one. The written document was drafted by an investigator from the

district attorney's office and was signed by various law enforcement officials present— the district attorney's investigator, the sheriff's investigators, and the community corrections director who was to perform the hypnosis. These governmental officials, by virtue of their positions, clearly had the apparent authority to bind the government in the matter of their representations to the defendant at that time. *Manning*, 672 P.2d at 506–07. We similarly have no difficulty in concluding that the defendant reasonably and detrimentally relied on the governmental promise by fully performing his side of the bargain in submitting to interviews under attempted hypnosis in relation to the continuing homicide investigation. The defendant was under no obligation to submit to these interviews, and, contrary to the People's argument, the fact that he may not have made any inculpatory statements during the hypnosis sessions is not inconsistent with detrimental reliance. *See Fisher*, 657 P.2d at 927.[2]

The critical questions in this case relate to the scope of the governmental promises and the remedy to which the defendant is appropriately entitled. The court of appeals held that because the term "passive involvement" was ambiguous, the written agreement of December 23, 1978, constituted a governmental promise of transactional immunity against prosecution for the sexual assault and killing of the two young women. We find such an interpretation basically flawed.

The word "passive" clearly connotes a state of inactivity, Webster's International Dictionary 1651 (3d ed. 1961); *State v. Terry*, 89 N.J.Super. 445, 215 A.2d 374, 377 (1965) (" '[p]assive' ... mean[s] inactive, quiescent, not active, permissive"), and when used as a modifier of "involvement" conveys a sense of relative rather than total inactivity. In our view, the term "passive involvement" is totally at odds

with the concept of "transactional immunity," which necessarily precludes the prosecution for any transaction about which a witness testifies. *See Steinberger v. District Court*, 198 Colo. 59, 596 P.2d 755 (1979); *Wheeler v. District Court*, 184 Colo. 193, 519 P.2d 327 (1974). Nothing in the written governmental promise or the circumstances surrounding its execution indicate that the governmental authorities intended to promise the defendant transactional immunity for his *active* participation in the offenses. *See, e.g., James v. State*, 157 Ga.App. 763, 278 S.E.2d 696 (1981) (direct evidence of defendant's conduct inconsistent with claim of passive involvement); *Crawford v. State*, 148 Ga.App. 523, 251 S.E.2d 602 (1978) (contrasting direct and affirmative involvement with passive involvement); *Gibson v. Foakes*, 212 N.J.Super. 709, 515 A.2d 1314 (1986) (contrasting passive involvement with active conduct which affirmatively influences or causes change). On the contrary, the only plausible construction of the term "passive involvement" is that the governmental officials intended to promise the defendant something less than complete transactional immunity in connection with the crimes under investigation.

While it might be argued that the term "passive involvement" was intended to confer immunity on the defendant for complicity in the sexual assault and killing of the young women, *see* § 18–1–603, 8B C.R.S. (1986) (under principle of complicity, a person is legally accountable as principal for criminal behavior of another if, with intent to promote or facilitate the commission of the crime, he aids, abets, or advises other persons in planning or committing the offense), the accepted view that aiding, abetting, or advising another to commit crimes involves active participation hardly comports with the diminished level of activity associated with the word "passive." *See, e.g., United States v. Crow Dog*, 532 F.2d

---

**2.** In arguing that the defendant did not rely on the promise, the People point to his testimony at the suppression hearing suggesting that he was not concerned that the statements he made under hypnosis might be used against him, and that he accepted the government's promise only because it "did sound good." However, other participants testified that the defendant and Cruz had asked about immunity, that the defendant "was afraid of what he might say under hypnosis being used against him," and that the defendant "wanted some guarantee" that what he said while under hypnosis would not be used against him.

1182, 1195 (8th Cir.1976) (aiding and abetting requires the existence of some affirmative participation), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *United States v. Peichev*, 500 F.2d 917, 920 (9th Cir.) ("a person is an aider and abettor ... if he actively assists"), *cert. denied*, 419 U.S. 966, 95 S.Ct. 229, 42 L.Ed.2d 182 (1974); *State v. Myers*, 158 N.W.2d 717, 720 (Iowa 1968) ("[t]o aid and abet means ... active participation"). We reject such an interpretation of the immunity agreement.

A second possible interpretation is that the term "passive involvement" was intended to immunize the defendant for his mere presence at the crime scene, or for his failure to come forward with information about the crime. This interpretation is consistent with that testimony of a sheriff's investigator concerning what the defendant was told prior to the commencement of the hypnosis session. Such a construction, however, could amount to nothing more than an illusory concession by the government for the defendant's cooperation, because if the defendant's so-called "involvement" consisted of nothing greater than his mere presence or knowledge, he arguably would not have been subject to criminal prosecution at all. *E.g., United States v. Sacks*, 620 F.2d 239 (10th Cir.1980); *United States v. Longoria*, 569 F.2d 422 (5th Cir.1978); *Lowe v. People*, 135 Colo. 209, 309 P.2d 601 (1957); *Jones v. Commonwealth*, 208 Va. 370, 157 S.E.2d 907 (1967). We thus reject this alternative construction also.

A third possible interpretation is that the term "passive involvement" was intended as a promise of immunity not for any active participation in the crimes themselves, but rather for subsequently harboring or concealing those who committed the crime or any physical evidence relating to the offenses. *See* § 18–8–105(1) and (2), 8B C.R.

S. (1986) (a person is accessory to crime if, with intent to prevent the discovery, apprehension, prosecution, or conviction of another for the commission of the crime, he renders assistance to such person; rendering assistance includes harboring or concealing the perpetrator, and concealing or destroying any physical evidence that might aid in his apprehension, prosecution, or conviction). Although some level of activity by the defendant would be required to render this kind of assistance, such involvement in the crime does not elevate the defendant to a level of participation comparable to that of a principal. *See Self v. People*, 167 Colo. 292, 448 P.2d 619 (1968); *Martinez v. People*, 166 Colo. 524, 444 P.2d 641 (1968); *Miller v. People*, 92 Colo. 481, 22 P.2d 626 (1933). From a common sense perspective, the conduct encompassed by the crime of accessory might well be considered as "passive involvement" relative to the conduct underlying the crime to which one is an accessory. Indeed, the cataloguing of the offense of accessory within that part of the Colorado Criminal Code entitled "Obstruction of Public Justice" suggests the same separation from the primary crime as does the term "passive involvement." [3] Given the terms of the written agreement and the circumstances surrounding its execution, our interpretation of "passive involvement" as connoting the defendant's participation as an accessory provides him with the most advantageous interpretation that reason and common sense will permit. Such construction accords the defendant substantial justice and, at the same time, accommodates the legitimate interests of the government in investigating criminal offenses and in apprehending and prosecuting the perpetrators of those offenses. *See Manning*, 672 P.2d at 512–13.

**3.** Old sections 40–1–12 and 40–1–13, 3 C.R.S. 1963 (repealed 1971 and superseded by §§ 18–1–603 and –8–105, 8B C.R.S. (1986)), codified in the Criminal Code under Article 2, "Offenses Against the Person," provided for the crimes of accessory during the fact and accessory after the fact. Those classifications perhaps best reflected a level of "passive involvement" in a

crime. *See Medina v. People*, 168 Colo. 255, 258, 450 P.2d 662, 664 (1969) (under section 40–1–13, a person is guilty of a distinct crime "who *merely* stands by, without interfering or giving ... help ..., but who ... is *not* aiding, abetting or assisting, as such, in the perpetration of the crime") (emphasis in original).

Construction of the written grant of immunity alone, however, fails to account for the defendant's concern prior to the commencement of the hypnosis session on December 23, 1978, that his statements during the hypnosis sessions would not be used against him. Prior to the drafting of the written agreement on "passive involvement," the officers assured the defendant, in response to his concern, that any statements made by him during the hypnosis sessions would not be used against him. Under these circumstances we believe it appropriate to hold the government not only to the promise emanating from the written agreement—that is, to refrain from prosecuting the defendant for being an accessory to the crimes of sexual assault and murder—but also to a promise based on the officers' oral representation that any statements made by the defendant during the hypnosis sessions would not be used against him.

▮▮▮ Providing the defendant "use immunity" results in prohibiting the state from making use of any statements made by the defendant during the hypnosis sessions and any evidence derived directly or indirectly from those statements. *See, e.g., Steinberger*, 198 Colo. 59, 596 P.2d 755; *Wheeler*, 184 Colo. 193, 519 P.2d 327.[4] Use immunity satisfies the defendant's concern prior to the hypnosis sessions that any statements made by him would not be used against him, holds the government to its oral representations, grants the defendant a remedy that is coextensive with the privilege against self-incrimination, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and places him in the same position as if he had made no statements at all to the authorities at the hypnosis sessions.

## D.

The state in this case did not prosecute the defendant for the crime of accessory. Furthermore, the trial court suppressed all statements made by the defendant at the hypnosis sessions, and there is nothing to indicate that any of the prosecution's evidence submitted at trial was derived from any such statements. In short, the record shows that the defendant was treated in a manner that was fully consistent with the government's oral and written promise made to him on December 23, 1978, and that accorded him his full constitutional due. The court of appeals, therefore, erred in holding that the defendant must be granted full transactional immunity and that the charges against him must be dismissed.

## III.

We next turn to the defendant's contention, not addressed by the court of appeals, that the trial court improperly admitted at trial the posthypnotic testimony of two witnesses, Cecelia Bieber and Officer Dennis Showalter.[5] Following the trial court's denial of the defendant's motion to limit the testimony of these witnesses to their prehypnotic recollections, the witnesses were called at trial and testified to the full range of their recollections. The defendant now claims that the trial court's evidentiary ruling ignored the consensus of scientific opinion and cases from other jurisdictions which hold that evidence obtained through hypnosis is unreliable and inadmissible per se; that the prosecution failed to show that the testimony at issue was not tainted by the hypnotic procedure; and that this unreliable evidence was highly prejudicial because it provided an additional circumstan-

4. As made clear in both *Steinberger* and *Wheeler*, however, evidence obtained wholly independently of that testimony immunized pursuant to the use immunity may serve as a basis for prosecuting the witness for activities and transactions, including those covered in his statements. *Steinberger*, 198 Colo. at 62, 596 P.2d at 757–58; *Wheeler*, 184 Colo. at 199, 519 P.2d at 331.

5. The defendant also asserts that he was hypnotized, and although he did not testify at the trial himself, he challenges the admission of testimony by various prosecution witnesses regarding communications he made to them after his hypnosis sessions in December 1978 and January 1979. Since the trial court found that he had not been hypnotized, the issue of the purported hypnosis of the defendant is dealt with separately in part IV, *infra*.

tial link between him and the crimes. We reject the defendant's claim.

### A.

This case is our first occasion to pass on the admissibility of posthypnotic testimony in Colorado courts. Although hypnosis by trained physicians or psychologists is generally recognized as a valid therapeutic technique, its usefulness as a forensic tool to stimulate accurate memory has not been unanimously accepted by the scientific and legal communities. While often used as an effective investigative resource,[6] various concerns have been expressed regarding the admissibility in criminal trials of "hypnotically enhanced" testimony. These concerns, which center on the risk of inducing inaccurate memories as the result of hypnosis, include the following: the subject may become "hypersuggestible" and "hypercompliant" and may attempt to please the hypnotist with answers the subject thinks will be met with approval; the subject may "confabulate"—that is, fill in details from the imagination in order to make an answer more coherent and complete; and the subject may experience "memory hardening," which gives him great confidence in both true and false memories and thus makes effective cross-examination more difficult. *Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 2713, 97 L.Ed.2d 37 (1987);[7] *see generally* Orne, *et al., Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?,* Issues and Practices in Criminal Justice (January 1985); R. Udolf, Forensic Hypno-

sis (1983); Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif.L.Rev. 313 (1980); Levitt, *The Use of Hypnosis to "Freshen" the Memory of Witnesses or Victims,* 17 Trial 56 (Apr. 1981); M. Orne, *The Use and Misuse of Hypnosis in Court,* in 3 Crime and Justice: An Annual Review of Research 61 (M. Tonry and N. Morris eds. 1981).

The concerns expressed by the scientific community are reflected to varying degrees in the approaches taken by courts confronted with the issue of the admissibility of hypnotically-enhanced testimony. At one end of the spectrum, some courts initially adopted a per se exclusionary rule, holding that hypnosis renders testimony so unreliable that a witness who has been hypnotized may not testify to any matters that were discussed at the hypnosis session. *See, e.g., State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); *State v. Palmer,* 210 Neb. 206, 313 N.W.2d 648 (1981). Some jurisdictions, including those originally adopting a categorical rule of exclusion, have modified the per se rule so as to prohibit a witness who has been hypnotized from testifying as to recollections from the time of hypnosis forward, but to permit the witness to testify to prehypnotic recollections if it can be proved that the trial testimony is the product of prehypnotic memory. *See, e.g., Contreras v. State,* 718 P.2d 129 (Alaska 1986); *State ex rel. Collins v. Superior Court,* 132 Ariz. 180,

---

6. Hypnosis has been "credited as instrumental in obtaining investigative leads or identifications that were later confirmed by independent evidence." *Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 2713–14, 97 L.Ed.2d 37 (1987); *see, e.g., People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S. 2d 255, 259, 453 N.E.2d 484, 488 (1983); *see generally* R. Udolf, Forensic Hypnosis 11–16 (1983).

7. In holding that Arkansas' per se rule prohibiting the admission of all hypnotically refreshed testimony violated the defendant's constitutional right to testify on her own behalf in a criminal case, the Supreme Court in *Rock* stated:

> A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual

case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections. The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial. 107 S.Ct. at 2714.

644 P.2d 1266 (1982) (supplemental opinion); *State v. Moreno,* 709 P.2d 103 (Haw. 1985); *State v. Koehler,* 312 N.W.2d 108 (Minn.1981); *State v. Patterson,* 213 Neb. 686, 331 N.W.2d 500 (1983); *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983); *State v. Peoples,* 311 N.C. 515, 319 S.E.2d 177 (1984); *State v. Martin,* 101 Wash.2d 713, 684 P.2d 651 (1984). This approach was followed by the Colorado Court of Appeals in *People v. Quintanar,* 659 P.2d 710 (Colo.App.1982), which held that recollections from the time of hypnosis forward are per se inadmissible, but that the witness may testify to prehypnotic recollections which have previously been unequivocally disclosed and recorded. *See also People v. Angelini,* 706 P.2d 2 (Colo.App.1985). Other courts have allowed witnesses to testify both to prehypnotic and posthypnotic recollections if the hypnosis was conducted in accordance with certain specific safeguards calculated to ensure the reliability of the hypnotic procedure, *see, e.g., State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981), or if the trial court has made an individualized inquiry in each case and determined that the testimony is reliable, *see, e.g., McQueen v. Garrison,* 814 F.2d 951 (4th Cir.1987); *Wicker v. McCotter,* 783 F.2d 487 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571 (1984) (applying "totality of circumstances" test). Finally, some courts have adopted what is virtually a per se rule of admissibility by holding that the fact of hypnosis goes only to the witness' credibility and the weight to be given to his or her testimony. *See, e.g., United States v. Awkard,* 597 F.2d 667 (9th Cir.), *cert. denied,* 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed. 2d 116 (1979); *State v. Wren,* 425 So.2d 756 (La.1983); *State v. Brown,* 337 N.W.2d 138 (N.D.1983); *Chapman v. State,* 638 P.2d 1280 (Wyo.1982).

### B.

Because we recognize that hypnosis has the potential to produce unreliable testimony, we cannot accept the view that hypnosis affects only the credibility or weight of posthypnotic testimony, and never its admissibility. At the same time, we believe that a per se rule of inadmissibility, even if limited to posthypnotic recollections, is unnecessarily broad and might well result in the exclusion of testimony that has adequate indicia of trustworthiness and would be helpful to the trier of fact.[8] We agree in this regard with the reasoning of the Idaho Supreme Court, which, in rejecting a per se approach to this issue, stated:

> While each of the ... approaches discussed above have merit, they all advocate to a greater or lesser extent a *per se* rule of admissibility or inadmissibility which is inconsistent with the general trend of witness competency that every person is competent to be a witness. While each of the ... approaches focuses on an important consideration to be evaluated by a trial court in determining competency, they do so to the exclusion of other considerations, and thus unnecessarily tie a trial court's hands in determining the competency of a witness to testify. If we were to adopt the rule that hypnotically induced testimony should be left to cross examination and impeachment, there would still be circumstances where testimony admitted under that rule had been rendered tainted and unreliable due to the methods used in hypnosis. Thus, a *per se* rule of admissibility would in some circumstances allow for the admission of unreliable testimony, an undesirable result in our judicial system, where we strive to reach verdicts based only on reliable testimony. On the other hand, a *per se* rule of inadmissibility ... would, in some circumstances, disallow reliable testimony, thus thwarting the truthseeking function of our judicial system. Finally, the third line of authority adopting safeguards to be used in hypnotic sessions, could also represent a *per se* rule if it were inter-

---

**8.** To the extent that *People v. Quintanar,* 659 P.2d 710 (Colo.App.1982), adopts such a per se rule of inadmissibility, it is expressly overruled. The United States Supreme Court has expressly disallowed the application of per se rules barring the posthypnotic testimony of defendants at their own trials. *Rock v. Arkansas,* —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).

preted to mean that, if the safeguards were followed, the testimony is always admissible, and if the safeguards were not followed the testimony is never admissible. We foresee circumstances where, even when the safeguards are not strictly or entirely followed, a trial court could nevertheless conclude that the testimony would still be sufficiently reliable for its admission.

*Iwakiri,* 682 P.2d at 577–78.

■■■ In our view, the admissibility of posthypnotic testimony, as of any testimony, depends ultimately on whether or not it is reliable. If the testimony is reliable and would be helpful to the trier of fact, the witness' testimony should be admitted. The rule we thus adopt is incompatible with either a per se rule of admissibility or a per se rule of inadmissibility. We accordingly hold that trial courts must make an individualized inquiry in each case to determine whether the trial testimony of a witness who has been hypnotized will be sufficiently reliable to qualify for admission.[9]

■■■ The following procedures should be followed in future cases involving the use of posthypnotic testimony. The party who intends to elicit trial testimony from a witness who has been previously hypnotized should timely advise the opposing party of the fact of hypnosis and make available for inspection any records dealing with the hypnosis sessions. Because hypnosis techniques can pose some risk of inducing an inaccurate memory, *see* Orne, *et al.,*

*Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?,* Issues and Practices in Criminal Justice; Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif.L.Rev. 313, the proponent of testimony from a previously hypnotized witness should bear the burden of establishing the reliability of such testimony whenever a challenge is made to its admissibility. While some courts have imposed a clear and convincing standard of proof on the issue of reliability, *e.g., State v. Hurd,* 86 N.J. 525, 432 A.2d 86, we believe the preponderance of evidence is the suitable standard for resolving this issue. The preponderance of evidence standard has often been referred to as the "orthodox view," since it is in keeping with the traditional burden applicable to the resolution of most preliminary questions of admissibility.[10] *See* E. Cleary, McCormick on Evidence § 53, at 136 n. 8 (3d ed. 1984); 1 J. Wigmore, Evidence § 17, at 771 n. 20 (Tillers rev. 1983). Indeed, it has been cogently observed that the preponderance of evidence standard "is appropriate for resolving most preliminary fact questions, even in a criminal case, and even when the reliability of the ultimate verdict is arguably affected by the decision on the preliminary issue." Saltzburg, *Standards of Proof and Preliminary Questions of Fact,* 27 Stan.L.Rev. 271, 291 (1975), *cited with approval in* 1 D. Louisell and C. Mueller, Federal Evidence § 35, at 266 (1977).[11] We accordingly adopt the prepon-

---

**9.** In holding that the posthypnotic testimony of a witness may be admitted at trial if found to be reliable, we are not holding admissible the out-of-court statements made by the witness while under hypnosis. Several courts addressing this issue have held such statements inadmissible. *E.g., Emmett v. State,* 232 Ga. 110, 205 S.E.2d 231 (1974); *State v. Harris,* 241 Or. 224, 405 P.2d 492 (1965); *State v. Pusch,* 77 N.D. 860, 46 N.W.2d 508 (1950).

**10.** The United States Supreme Court has held that the preponderance standard is applicable in determining the constitutional admissibility of a confession. *Lego v. Twomey,* 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Other federal courts have expressly found a preponderance standard to be sufficient for purposes of resolving other preliminary questions of admissibility. *E.g., United States v. Petrozziello,* 548 F.2d 20

(1st Cir.1977) (proof of conspiracy as precondition for admitting statement of co-conspirator); *In re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983) (foundation for business records exception). This standard is not the most lax standard used for judging admissibility of evidence. *See* 1 J. Wigmore, Evidence § 17, at 771–72 n. 20 (Tillers rev. 1983) (standard for admissibility of conditionally relevant evidence is less than preponderance of evidence, in that proponent need only establish to the satisfaction of the judge that there is sufficient evidence to support jury finding that condition in question more probably than not exists).

**11.** Professor Saltzburg marshalls the following arguments in support of this view:
First, few cases actually involve a coincidence between preliminary facts and ultimate is-

derance of evidence standard for resolving challenges to the reliability of testimony from a previously hypnotized witness.

■ The central inquiry at a challenge to admissibility is whether, notwithstanding the events occurring during the hypnosis session, the witness' trial testimony will be sufficiently reliable to be admissible. *State v. Armstrong*, 110 Wis.2d 555, 329 N.W.2d 386, *cert. denied*, 461 U.S. 946, 103 S.Ct. 2125, 77 L.Ed.2d 1304 (1983). In ruling on the admissibility of posthypnotic testimony, the trial court should consider the totality of circumstances bearing on the issue of reliability, including the following factors: the level of training in the clinical uses and forensic applications of hypnosis by the person performing the hypnosis; the hypnotist's independence from law enforcement investigators, prosecution, and defense; the existence of a record of any information given or known by the hypnotist concerning the case prior to the hypnosis session; the existence of a written or recorded account of the facts as the hypnosis subject remembers them *prior* to undergoing hypnosis; the creation of recordings of all contacts between the hypnotist and the subject; the presence of persons other than the hypnotist and the subject during any phase of the hypnosis session, as well as the location of the session; the appropriateness of the induction and memory retrieval techniques used; the appropriateness of using hypnosis for the kind of memory loss involved; and the existence of any evidence to corroborate the hypnotical-

ly-enhanced testimony. *See McQueen v. Garrison*, 814 F.2d 951 (4th Cir.1987); *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571; *State v. Hurd*, 86 N.J. 525, 432 A.2d 86; Orne, *et al.*, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?*, Issues and Practices in Criminal Justice 41–49; Quarles, *Hypnosis and the Law of Evidence: Testimony from the Hypnotically–Refreshed Memory*, 51 Miss.L.J. 743, 753–64 (1981). If, after considering the totality of the circumstances, the court is satisfied that the witness' recollection has not been so affected by the hypnosis as to render the witness' trial testimony unreliable, it may admit the testimony and may further permit the witness to be cross-examined on the fact and circumstances of the pretrial hypnosis as affecting the credibility and weight of the testimony. If the court is not so satisfied, it should exclude the witness' testimony. In either event, the trial court should make adequate findings so as to permit meaningful appellate review of this evidentiary issue.

### C.

■ In this case the trial court determined that the trial testimony of witnesses Cecelia Bieber and Officer Showalter was not rendered unreliable by their having been previously hypnotized. Although no formal protocol was followed in the hypnosis sessions involving these witnesses, we are nonetheless satisfied that the trial court properly considered the totality of

sues; one must actually strain to find such cases. Thus in the typical case we need not fear that the preliminary fact question is the twin of the ultimate question. Second, it is relatively rare that a preliminary fact is virtually dispositive of the issue of guilt. In most instances resolution of preliminary questions of fact against a defendant results in small bits of information, none of which by itself is overwhelming, being introduced against him. Third, the reliability problems are really not that great with some kinds of unreliable evidence, such as various exceptions to the hearsay rule. Fourth, even where reliability problems are clear, certain kinds of evidence may tend to be only minimally prejudicial. Fifth, the defendant is permitted to introduce arguably unreliable evidence upon a preponderant showing that the applicable competency rule is satisfied. To permit him to meet this lesser burden while the prosecution bears a heavier burden on each preliminary fact question in addition to the burden on the merits might grossly distort the amount of protection to which a defendant has been historically entitled. Sixth, and most important of all, in most instances there is no good reason why a court or legislature cannot choose to give a defendant limited protection. It is hard to argue that the Government must make an all or nothing choice—that is, either it must deny any protection by refusing to adopt or to continue a rule of evidence, or it must adopt a rule that protects a defendant against almost all errors in its implementation. Saltzburg, *Standards of Proof and Preliminary Questions of Fact*, 27 Stan.L.Rev. 271, 291–92 (1975).

circumstances, including the possibility of suggestive influences resulting from the techniques used during the hypnosis sessions, in determining that their testimony was reliable. The trial court's resolution of this evidentiary issue is adequately supported by the record.

The record demonstrates that the testimony of both witnesses was corroborated. Bieber's identification of Joe Salas was merely cumulative of the testimony of several other witnesses who saw Salas at the Northern Hotel on the night in question. Similarly, other testimony besides Showalter's placed the defendant at the hotel that night. In fact, before the defendant participated in any hypnosis sessions he had told police detectives that he had been at the hotel that night, had talked to the Mata sisters, and had danced with one of them.

In addition to this substantial corroboration, there was some evidence indicating that no part of Bieber's and Showalter's trial testimony was the product or the result of the hypnosis sessions. Although Bieber was unable immediately after the homicide to name the man she saw leaving the Northern Hotel with the Mata sisters on the night of April 28–29, 1978, she identified that man at the motions-hearing and at trial as Joe Salas. She testified at the motions-hearing to the reason for her delayed awareness of Salas's identity, explaining that she first met Salas in May 1979, and that although she did not tell the authorities his name until the March 1981 hypnosis session, she had remembered his name when she was in Iowa in 1979. Officer Showalter testified to having seen the defendant, Porfirio Romero, and Joe Salas at the hotel on the night in question. At the motions-hearing he explained that he had volunteered that information to the police well before his hypnosis session, and that he was hypnotized only in order to help him remember further details of what he had seen.

It was for the trial court to assess the motions-hearing testimony of Bieber and Showalter, along with all the other evidence admitted at the hearing, in determining whether the reliability of their recollections was detrimentally affected by the hypnosis sessions. The record supports the trial court's determination that the testimony of these witnesses was not rendered unreliable by their having been previously hypnotized. We thus conclude that the trial court did not err in admitting their testimony at trial.

## IV.

■ The defendant's final contention, also not addressed by the court of appeals, is that the record does not support the trial court's finding that he had not been hypnotized. We again reject the defendant's claim.

In addition to seeking to exclude posthypnotic recollections of other witnesses, the defendant argued prior to trial that hypnosis had also tainted the reliability of his own recall. Following the hearing on the hypnosis issue, the trial court found that the evidence did not support a conclusion that the defendant "was actually in an altered hypnotic state of mind" and accordingly did not further address the question of what effect, if any, the hypnosis sessions had on the reliability of the defendant's subsequent statements. The defendant now contends that the trial court's finding was clearly erroneous and unsupported by the record, and that the court reached this erroneous conclusion largely because it overlooked the fact that, as defense expert Dr. Bernard Diamond testified, neither the subject nor the hypnotist can distinguish a simulated hypnotic state from a real one.[12]

---

**12.** The defendant argues that the prosecution had the burden of proving by clear and convincing evidence that he was not hypnotized; but he points to no authority—nor have we located any—that would warrant the imposition of such a burden on the prosecution. *People v. Hughes,* 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E.2d 484 (1983), cited by the defendant, holds that the state has the burden of demonstrating by clear and convincing proof that the testimony of a witness as to his prehypnotic recollections will be reliable. This case, however, does not address the issue of the burden of proof on the question of whether an individual was or was not hypnotized. By finding that *Hughes* is not applicable here, we do not mean to imply that the admissibility of posthypnotic testimony should be determined under the clear and con-

We are satisfied that the record supports the trial court's ruling on this issue. At the hearing the hypnotist who conducted the December 1978 hypnosis session testified that he was not certain whether the defendant had been in a hypnotic trance at the session, but that "if I would have to choose [an opinion], I would assume he was in a very light trance." The hypnotist also expressed the opinion, however, that the defendant was using the "trance" as a vehicle or excuse to give information to the authorities. The psychologist who conducted the defendant's second hypnosis session, in January 1979, testified that in his opinion the defendant was not in a trance at that session. In explaining the basis for his determination, he noted that the defendant did not exhibit certain characteristic signs of hypnosis such as eyelid flutter and deep breathing. Moreover, a police investigator who interviewed the defendant in March 1981 testified that the defendant told him at that time that "he had not been in a hypnotic state at any time during [the hypnosis] sessions ... and that the reason he had pretended he was in a hypnotic state was that he felt that the information he was going to be giving at that time would be more believable, and that was important to him at the time, ... to be believed."

The testimony of these witnesses provides ample support for the trial court's finding that the defendant was not hypnotized. The trial judge was not obliged to disregard this testimony simply because there was other testimony which indicated that it is difficult for a hypnotist or a subject to tell if the subject is hypnotized. It was within the province of the trial court to weigh the testimony of witnesses, including expert witnesses, in determining the factual question of whether the defendant was or was not hypnotized. *See, e.g., People v. King,* 181 Colo. 439, 510 P.2d 333 (1973).

A trial court's factual findings supported by competent evidence in the record will not be disturbed on appeal. *E.g., People v.*

*Corley,* 698 P.2d 1336 (Colo.1985); *People v. Donnelly,* 691 P.2d 747 (Colo.1984). In this case the record supports the trial court's finding that the defendant was not hypnotized. Since statements made by the defendant after the hypnosis sessions were thus not "tainted" by hypnosis, it was not error for the trial court to allow prosecution witnesses to testify to inculpatory statements made to them by the defendant after the sessions.

### V.

In summary, we reverse the court of appeals' holding that the defendant is entitled to transactional immunity as to the charges filed against him and that the charges should be dismissed. We also conclude that the trial court's rulings on the hypnosis issues were not erroneous and thus do not provide alternative bases for reversing the conviction. We accordingly reverse the judgment of the court of appeals and reinstate the judgment of conviction.

LOHR, J., specially concurs.

MULLARKEY, J., joins in the special concurrence.

KIRSHBAUM, J., concurs in part and dissents in part.

LOHR, Justice, specially concurring:

As the majority notes in section III, this case presents our first opportunity to pass on the admissibility of post-hypnotic testimony. In adopting an approach to this type of evidence, however, we are constrained by the recent decision of the United States Supreme Court in *Rock v. Arkansas,* — U.S. —, 107 S.Ct. 2704, 97 L.Ed. 2d 37 (1987). In light of the implications of *Rock,* I accept the approach adopted by the majority, which requires the trial court to make an individualized inquiry into the reliability of a witness' post-hypnotic testimony. I agree as well with the majority's conclusion that under this approach the

vincing standard of proof. As we note in Part III B of our opinion, the proponent of testimony from a witness who has been hypnotized must establish the reliability of such testimony by a preponderance of evidence.

testimony of Cecilia Bieber and Officer Showalter was properly admitted.

## I.

As Justice Kirshbaum describes in his dissent, hypnosis has long been recognized as a valid therapeutic tool, however, there is considerable controversy regarding the use of hypnosis as a means to refresh memory. The majority discusses briefly the concerns of the scientific community, yet downplays the growing consensus about the veracity risks associated with the use of hypnotically refreshed testimony.

The Council on Scientific Affairs of the American Medical Association reviewed the studies and literature on refreshing memory through hypnosis, Report of the Council on Scientific Affairs, American Medical Association, *Scientific Status of Refreshing Recollection by the Use of Hypnosis*, 253 J.A.M.A. 1918 (1985), and reiterated the problems with post-hypnotic testimony that others have also described:

> hypnosis can increase the number of meaningful items remembered but it also increases overall productivity; thus, hypnosis increases the number of both correct and incorrect statements.... There are no techniques based on the individual's report that can discriminate reliably between a true and false memory report in any specific case.

*Id.* at 1920. Hypnosis can also lead to "an increased vulnerability to subtle cues and implicit suggestions that may distort recollections in specific ways...." *Id.* at 1922. Since the subject cannot differentiate accurate recollections from "pseudomemories," "hypnosis may increase the appearance of certitude without a concurrent increase in veracity." *Id.* at 1921. The Council recommended that the use of hypnosis to enhance recall of witnesses and victims be limited to investigative purposes, and that even for those purposes specific procedural safeguards should be employed. *Id.* at 1922. *Accord*, M.T. Orne, D. Soskis, D. Dinges, E.C. Orne & M. Torny, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?* 1985 National Inst. of Just., Issues and Practices in Crim. Just. 1, 41–49; R. Udolf, *Forensic Hypnosis* (1983); Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313 (1980).

## II.

Because of the veracity risks associated with hypnotically refreshed testimony, an increasing number of states have been adopting some form of a per se inadmissibility rule. However, the recent decision of the United States Supreme Court in *Rock v. Arkansas*, —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), seems to dictate an approach to post-hypnotic testimony similar to that developed by the majority in this case.

In *Rock*, a majority of the court held that the "Arkansas *per se* rule excluding all post-hypnosis testimony infringes impermissibly on the right of a defendant to testify on his or her own behalf." *Id.* at 2714–15. The majority stated that the right to testify on one's own behalf is grounded in the fourteenth amendment's guarantee of due process of law, the compulsory process clause of the sixth amendment, and is a necessary corollary of the fifth amendment guarantee against compelled testimony. *Id.* at 2709–10. The Court acknowledged the problems with hypnotically refreshed testimony, yet expressed the view that effective cross-examination, expert testimony on hypnosis, and cautionary instructions can reduce the dangers of such testimony. *Id.* at 2713–14.

The decision emphasized that the Arkansas per se rule did not leave the trial court the discretion to consider whether post-hypnosis testimony may be reliable and admissible in a particular case. As the United States Supreme Court stated:

> A State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the

State repudiating the validity of all post-hypnosis recollections.

*Id.* at 2714.

Although the actual holding of *Rock* is limited to a rejection of a per se rule that prevents a defendant from testifying, the language of the opinion has broader implications. The right to testify protected in *Rock* is grounded in part in the sixth amendment's compulsory process clause, which grants the defendant the right to call "witnesses in his favor," and this suggests that the approach in *Rock* should also apply to the defendant's witnesses. I agree with Justice Kirshbaum that it is difficult to find a principled basis for allowing the defendant to offer post-hypnosis testimony while excluding that of other defense witnesses. Similarly, if the defense witnesses can present hypnotically enhanced testimony, it is unfair to prevent the prosecution from introducing such evidence. The language of *Rock* also suggests that other obstacles to the admission of post-hypnotic testimony, such as requiring reliability to be established by clear and convincing evidence, or conditioning the admissibility of such testimony on adherence to strict procedural requirements, may also be problematic, since these requirements may keep out otherwise reliable testimony.

The decision suggested that:

The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of post-hypnosis testimony and it may be able to show that testimony in a particular case is so unreliable that exclusion is justified. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial.

*Id.* at 2714. The opinion in *Rock* seems to say that the federal constitution requires flexible guidelines that leave the trial court with discretion to assess the reliability of the testimony in each individual case. Therefore, I accept the test and the preponderance of evidence standard set forth by the majority in part III of its opinion. This approach provides the trial court with guidelines to assess the reliability of evidence yet allows the court to adapt these guidelines to the unique circumstances of each case.

### III.

As Justice Kirshbaum describes, the neutrality of the hypnotic sessions in this case is questionable. However, the trial court held a hearing on the admissibility of the post-hypnosis evidence of Beiber, Showalter and the other witnesses. The court heard the testimony of these witnesses, as well as the testimony of experts on the effects of hypnosis. As the majority points out, it was for the trial court to assess this evidence and to determine whether the reliability of the witnesses' recollections was detrimentally affected by hypnosis. In its ruling on this issue, the trial court considered the testimony of the witnesses who had been hypnotized and reviewed the cases and literature on the topic of hypnotically enhanced testimony. The court recognized that there had been "some suggestion" in the hypnosis of the witness Bieber, but determined that her testimony was not rendered inadmissible.

Although the court did not have the guidelines developed by the majority in this case to assist in its determination, the ruling of the trial court reveals that it did consider similar criteria in assessing the admissibility of the evidence. In fact, the trial court demonstrated its awareness of the relevant factors by developing its own list of guidelines for future use in cases involving hypnotically enhanced testimony. Since the trial court has already made the requisite determination, and it is not clearly erroneous, I agree with the majority that the trial court did not err in admitting the testimony at trial.

I am authorized to say that Justice MULLARKEY joins in this special concurrence.

KIRSHBAUM, Justice, concurring in part and dissenting in part.

The majority concludes in Part III of its opinion that a party seeking to offer hyp-

notically enhanced testimony has the burden of establishing by a preponderance of the evidence "whether the trial testimony of a witness who has been hypnotized will be sufficiently reliable to qualify for admission." Maj. op. at 1016. In recent years most scientific scholars and researchers examining the efficacy of hypnosis in the context of adjudicatory proceedings have concluded that hypnotically enhanced testimony is inherently unreliable and is not susceptible to testing for reliability in particular cases by experts or by laypersons employing traditional methods of ascertaining witness reliability. Yet, in *Rock v. Arkansas*, —— U.S. ——, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), a majority of the United States Supreme Court held that a defendant in a criminal case has a right grounded in sixth amendment principles to testify even though the testimony has been enhanced hypnotically. I can see no principled basis to suggest that a defendant has no such right to offer a *witness* who will present hypnotically enhanced testimony, and, similarly, the prosecution must also be able to introduce such evidence. Based on the current consensus of scientific exploration of the forensic use of such testimony, I am far from confident that persons who have been hypnotized can be presumed to remain competent to testify in judicial proceedings. However, in view of *Rock*, I am unable to conclude that courts may prohibit the introduction of hypnotically enhanced testimony in criminal proceedings. I, therefore, reluctantly agree with the majority's conclusion that such evidence is admissible in limited circumstances.

I do conclude, however, that a party seeking to offer such evidence must do more than satisfy a preponderance of the evidence standard in seeking to demonstrate the "reliability" of what to a reasonable degree of scientific certainty appears to be inherently unreliable evidence. I believe a clear and convincing evidence standard is required. I also conclude that the testimony of Bieber and Officer Showalter is inadmissible even under the majority's less stringent preponderance of the evidence standard, and therefore dissent to that portion of the majority opinion approv-

ing the admission of the testimony of these two witnesses.

I

The medical use of hypnosis has long been recognized as a legitimate tool in therapeutic settings. American Medical Association, *Medical Use of Hypnosis*, 168 J.A.M.A. 186 (1958). However, as Dr. Martin Orne, one of the foremost authorities on hypnosis, has noted, while techniques employed in a therapeutic setting to "relive" and "remember" events in the patient's life may prove quite beneficial in relieving a psychological symptom regardless of whether the events "remembered" actually occurred, the use of hypnosis in forensic settings requires closer scrutiny. M.T. Orne, D. Soskis, D. Dinges, E.C. Orne & M. Tonry, *Hypnotically Refreshed Testimony: Enhanced Memory or Tampering with Evidence?* 1985 National Inst. of Just., Issues and Practices in Crim. Just. 1, 14–16 [hereinafter *Hypnotically Refreshed Testimony* ]. Dr. Orne notes that most individuals, even those who are only moderately hypnotizable, characteristically undergo a suspension of critical judgment while in the hypnotic state and, therefore, display an increased willingness to report as accurate details of a prior event that they would normally reject as too uncertain to report. *Id.* at 6–7, 19. The hypnotic state by its very nature is one in which the hypnotized individual becomes especially susceptible to suggestion—far more susceptible, for example, than a nonhypnotized individual being subjected to leading questions. *Id.* at 6–10. When exposed to express or inadvertent suggestion by the hypnotist, to preconceptions about what will occur during the hypnosis session or to the pressure of being asked to provide specific details about a prior event, the hypnotized person frequently responds by "confabulating"—i.e., filling in the gaps in memory with what appear to be quite plausible details extracted from the imagination or from actual events that occurred at another time. *Id.* at 6–10. Dr. Orne concludes that when an individual obtains "information about the event from the media, from

comments made prior to, during, or after an interrogation, or from the hypnotic session itself," there is "a significant likelihood that this information ... will become inextricably intertwined with the [hypnotized individual's] own memories of the event." *Id.* at 30. Moreover, subsequent to being hypnotized, an individual typically displays an extreme degree of confidence and certitude in the "memories" evoked during hypnosis, including the inaccurate details seemingly "recalled," and neither experts nor laypersons are capable of discerning, without independent factual corroboration, which details reported by the individual are accurate and which are inaccurate. *Id.* at 25–27.

In explicit recognition of the substantial unreliability of hypnotism as a method of enhancing accurate recollection of details by witnesses, Dr. Orne has recommended that forensic hypnotism be restricted to use in investigative situations only, and then only in conjunction with implementation of a series of imperative "safeguards," including hypnosis by a psychiatrist or mental health professional in a neutral setting, videotaping of all contact between hypnotist and subject, allowing only the hypnotist and subject to be present at the hypnosis session, conducting a pre-hypnosis psychological examination of the subject and requiring that observers outside the room communicate questions to the hypnotist only in writing. *Id.* at 41–49. The vast consensus among scientific researchers and commentators, based on substantially similar findings reached by virtually every reputable clinical and other scientific study in the area, accords with Dr. Orne's views that hypnosis cannot serve as a reliable means of accurately refreshing an individual's memory and, therefore, should be limited to therapeutic and investigative use only. *E.g.,* Report of the Council on Scientific Affairs, American Medical Association, *Scientific Status of Refreshing Recollection by the Use of Hypnosis,* 253 J.A.M.A. 1918 (1985) [hereinafter American Medical Association]; R. Udolf, *Forensic Hypnosis* (1983); *Hypnotically Refreshed Testimony* at 32 n. 10 (noting that the International Society of Hypnosis and its constituents, American Society of Clinical Hypnosis and Society for Clinical and Experimental Hypnosis, all composed of physicians, psychologists, dentists and clinical social workers, overwhelmingly endorsed a 1979 resolution strongly opposing the use of hypnosis by law enforcement personnel); Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Calif.L.Rev. 313 (1980).[1]

Although hypnotized persons on occasion provide useful investigative leads to police personnel, such as a partial identification of a critical license plate number, it appears that the efficacy of hypnosis as an investigative tool is limited primarily to situations where the facts in question are not known or presumed by law enforcement authorities. *Hypnotically Refreshed Testimony, supra,* at 5, 30–31; *see also* American Medical Association, *supra,* at 1922 (noting lack of scientific support for anecdotal claims of success of hypnosis as an investigative tool, but concluding that hypnosis may be useful in the purely investigative setting, where many inaccurate facts are recalled, if even a single accurate recall provides a useful lead to important evidence). Even in those circumstances, however, use of hypnosis may seriously mislead investigative efforts of law enforcement officers. *Hypnotically Refreshed Testimony, supra,* at 31.

In *People v. Anderson,* 637 P.2d 354 (Colo.1981), this court concluded that the results of polygraph tests and testimony

---

1. In addition to the inherent suggestibility of having a police officer conduct the hypnosis session, there is some basis for concern that the individual being hypnotized may be harmed by the recall of emotions associated with traumatic events. The consensus of the medical and mental health communities is that law enforcement personnel are ill-trained to deal with such an occurrence and may well exacerbate the harm.

*E.g.,* American Medical Association, *supra,* at 1921; *Hypnotically Refreshed Testimony, supra,* at 32; *see also* Or.Rev.Stat. §§ 136.675, 136.685 (1985) (law enforcement personnel required to inform subject of risks of psychological side effects of hypnosis; subject may request hypnosis be conducted by licensed physician or licensed psychologist at no cost to subject).

concerning those results were per se inadmissible as evidence in criminal proceedings. This conclusion was predicated upon the lack of general acceptance of the accuracy of polygraph test results in the relevant scientific communities, the unreliability of polygraph testing techniques and the lack of qualification standards for examiners. These factors led this court to conclude that admission of polygraph evidence at trial had a serious potential for misleading the jury and would cause unfair prejudice. Here, as in *Anderson*, we are confronted with an evidence-eliciting technique which has in recent years been found unreliable in forensic settings by a substantial majority of the relevant scientific community. Under these circumstances, hypnotically refreshed testimony must be deemed admissible against a defendant in a criminal trial only under the most stringent of safeguards, and then only to the extent the testimony is clearly shown to have a pre-hypnotic foundation. The imposition of a burden on the proponent of post-hypnotic testimony to establish the reliability thereof with reference to corroborating pre-hypnosis facts by clear and convincing evidence will diminish the likelihood that fundamentally unreliable evidence will be introduced in criminal proceedings.[2]

The predominant view among courts considering the issue in light of the views of most scientific experts that hypnotic refreshment of recollection produces dangerously unreliable testimony is that post-hypnotic testimony as to "recollections" enhanced or elicited under hypnosis is inadmissible. Some courts conclude such testimony is per se inadmissible; others conclude that such testimony is admissible only with regard to matters the witness related prior to hypnosis. *E.g., Contreras v. State*, 718 P.2d 129 (Alaska 1986) (witness may only testify to facts related by witness prior to hypnosis); *Collins v. Superior Court*, 132 Ariz. 180, 644 P.2d 1266 (1982) (same result); *State ex rel. Elliotte v. State*, 515 A.2d 677 (Del.1986) (witness

may testify within scope of pre-hypnotic recollection if pre-hypnotic recollection can be reliably ascertained and proponent shows by clear and convincing evidence that right to cross-examine witness not substantially impaired); *Bundy v. State*, 471 So.2d 9 (Fla.1985) (hypnotically refreshed testimony per se inadmissible), *cert. denied*, —— U.S. ——, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986); *Walraven v. State*, 255 Ga. 276, 336 S.E.2d 798 (1985) (witness may only testify to statement made prior to hypnosis; proponent of identification must show clear and convincing evidence that identification did not arise from hypnosis); *State v. Moreno*, 709 P.2d 103 (Haw.1985) (witness may only testify to matters recalled prior to hypnosis); *People v. Wilson*, 116 Ill.2d 29, 106 Ill.Dec. 771, 506 N.E.2d 571 (1987) (same result); *Drake v. State*, 467 N.E.2d 686 (Ind.1984) (testimony which can be shown by clear and convincing evidence to have basis independent of hypnosis is admissible); *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (witness may only testify to matters recalled prior to hypnosis), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 575, 88 L.Ed.2d 558 (1985); *Commonwealth v. Kater*, 394 Mass. 531, 476 N.E.2d 593 (1985) (same result); *State v. Nixon*, 421 Mich. 79, 364 N.W.2d 593 (1984) (same result; noting that witness' deposition could be taken prior to hypnosis to preserve testimony); *State v. Koehler*, 312 N.W.2d 108 (Minn.1981) (witness may only testify to matters unequivocally disclosed by witness prior to hypnosis); *Alsbach v. Bader*, 700 S.W.2d 823 (Mo.1985) (witness may only testify to matters recalled prior to hypnosis; testimony inadmissible because facts did not demonstrate pre-hypnosis corroboration); *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986) (witness may testify only to matters recalled prior to hypnosis), *cert. denied*, —— U.S. ——, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987); *People v. Hughes*, 59 N.Y.2d 523, 466 N.Y.S.2d 255, 453 N.E. 2d 484 (1983) (same result); *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984)

---

2. The issue of whether hypnotically refreshed testimony is admissible against a defendant is, of course, entirely distinct from the issue, decided in *Rock v. Arkansas*, —— U.S. ——, 107 S.Ct.

2704, 97 L.Ed.2d 37 (1987), of whether a defendant in a criminal trial has a right to present his or her own hypnotically refreshed testimony.

(same result); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981) (hypnotically refreshed testimony inadmissible until court is presented with more conclusive proof of reliability); *State v. Martin*, 101 Wash.2d 713, 684 P.2d 651 (1984) (witness may only testify to facts recalled prior to hypnosis). I find the imposition of a clear and convincing evidence burden on the proponent of such testimony, together with the requirement of corroboration by pre-hypnosis evidence and the caveat that any hypnosis session must be conducted in accordance with the procedural safeguards articulated in the majority opinion, constitutes an acceptable prophylactic approach to the problems created by the fact of hypnotic enhancement.

## II

In this case, the testimony of Bieber and Officer Showalter should have been rejected even under the minimal test adopted by the majority. The People did not establish by a preponderance of the evidence that certain precautions were taken to at least reduce, though not eliminate, the likelihood of unreliability.[3] A review of the transcript of the October 1981 suppression hearing indicates that during Bieber's first hypnosis session she was hypnotized in the sheriff's office by Captain Kelly. Two other police officers were present and asked questions. Bieber was told specifically that she would remember things she had forgotten before, and she was eager to assist the police by providing new information. The setting and the presence of numerous police interrogators is scarcely sufficient to satisfy concepts of neutrality and independent examination.

A week before her second hypnosis session, Bieber was interviewed by Officer Phil Wilson. After she stated that the man she saw leaving the Northern Hotel behind the victims had an Afro hairstyle, Officer Wilson told her that Joe Salas had an Afro hairstyle at the time of the murders. The second hypnosis session was also conducted at the sheriff's office by a police officer, Officer Del Bean, with Officer Wilson present. During hypnosis Bieber stated that she could not see the face of the man who left the Northern Hotel behind the victims, but then identified that man as Joe Salas. When asked, "Has anybody else told you they thought it was Joe Salas?", she replied, "Yes, Mr. Wilson." Neither of the hypnosis sessions was videotaped, and only portions of the audiotapes recorded during the sessions were audible. No independent evidence was introduced to corroborate Bieber's identification of Joe Salas as

---

**3.** *Cf. State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981) (adopting the following "safeguards" originally proposed by Dr. Orne: A psychiatrist or psychologist experienced in the use of hypnosis must conduct the session; the professional conducting the session should be independent of and not regularly employed by the prosecution, police or defense; any information given to the hypnotist prior to the hypnotic session must be recorded; before inducing hypnosis, the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them; all contacts between hypnotist and subject must be recorded; and only the hypnotist and subject should be present during hypnosis). *Accord, e.g., House v. State*, 445 So. 2d 815 (Miss.1984); *see also* Cal.Evid.Code § 795 (West 1985) (testimony of witness in criminal proceeding is not inadmissible if *all* the following met: testimony limited to matters recalled and related prior to hypnosis; pre-hypnotic memory was preserved prior to hypnosis; written record was made of subject's pre-hypnosis recall and of information provided to hypnotist; subject gave informed consent; all interviews between subject and hypnotist were videotaped; hypnosis was performed by independent licensed medical doctor or psychologist; prior to admission, court holds a hearing at which proponent proves by clear and convincing evidence that pre-hypnosis recall is not unreliable and that ability to cross-examine is not substantially impaired). Here, the majority's list of suggested factors for the trial court to consider in determining admissibility is apparently patterned after the *Hurd* test, although the *Hurd* court required that the proponent of the hypnotically refreshed testimony establish its admissibility by clear and convincing evidence. Dr. Orne, whose view is shared by the vast majority of the relevant scientific community, has indicated that strict compliance with all of the guidelines will at most reduce the possibility of suggestiveness, but will not prevent subjects from inadvertently distorting memories or placing undue confidence in these distorted memories. *Hypnotically Refreshed Testimony, supra*, at 41–51; American Medical Association, *supra*, at 1922–23.

the person in whose company the victims were last seen alive.[4] Bieber's explanation that she did not identify Salas immediately after the murders because she did not meet Salas until approximately a year later is directly refuted by her own testimony at the suppression hearing that she in fact had seen Joe Salas prior to the time of the murders and would have recognized him before she was formally introduced to him in May of 1979.[5]

Officer Showalter was also hypnotized under highly suggestive circumstances. The hypnosis session was conducted by Captain Kelly, Showalter's superior officer, in the Fort Collins police station. At that time, he knew Porfirio Romero and Joe Salas had been arrested for the murders in question. During the hypnosis session, Showalter was told by the hypnotist that any blocks to memory would be removed. The hypnotist also asked Showalter, "What are we supposed to recall for the [sheriff's office]?" Prior to the hypnosis session, Showalter did not document in any written report that he had seen the defendant, Porfirio Romero and Joe Salas, at the hotel together on the night in question, although he stated at the suppression hearing that he had informed police investigators of that fact some time before he was hypnotized.[6]

Based on the requirements that the hypnotic session must be performed in a neutral setting, and must be conducted by an independent, scientifically trained hypnotist, these sessions fell far below the acceptable level of neutrality. No independent confirmation of critical "refreshed" recollections was introduced; to the contrary, the evidence shows that Bieber knew who Salas was, though not his first name, before she "remembered" that she had seen him. The hypnotist who conducted Showalter's hypnotic session strongly suggested that Showalter was expected to recall something not previously reported. Given these factors, and considering the strong likelihood that both witnesses responded to overt and non-overt suggestions of police officers rather than to any independent refreshed recollection, I would conclude that the People failed to establish by a preponderance of the evidence that the testimony of these witnesses was reliable.

For the foregoing reasons, I respectfully dissent to part III of the majority opinion.

---

4. Because the sources of memories become confused as a result of hypnosis and, therefore, witnesses who have been hypnotized often later assert that the new recall preceded rather than followed the hypnosis session, it is particularly inappropriate to rely on the post-hypnotic testimony of the subject to establish which memories existed prior to hypnosis. See *Hypnotically Refreshed Testimony, supra,* at 35–36.

5. The following colloquies took place between counsel and Bieber at the suppression hearing:

Q You did not know Joe Salas in May of 1978; is that correct?
A I knew he was a Salas, but I didn't know his name. I didn't know his first name.
Q You had seen him before.
A I had seen him but not to have a conversation with him or not even to say hi. I knew that he was a Salas because I know his brother, Raul, his older brother Raul; and when we were all kids in the neighborhood, I knew

he was his young brother, and that's how I knew Joe before that, but I never had a conversation with him.
. . . .
Q In April of 1979, did you realize that Mr. Salas had been arrested?
A In April 1979?
Q Yes.
A (Pause)
Q After the death of the Mata girls.
A Yes. I was aware that he was arrested.
Q You knew his name at that time.
A Yes.
Q Do you know what he looked like at that time?
A Not in April, no. I mean—if I seen him walking across the street, I would know that he was Joe Salas, yes.

6. *See supra* note 4.